## GROSS *v.* STATE

[No. 234, September Term, 1963.]

430

*Decided July 3, 1964.*

*Motion for rehearing filed July 31, 1964, denied September 15, 1964.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT, MARBURY and SYBERT, JJ.

*Nelson R. Kandel* for appellant.

*Robert L. Karwacki, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, William J. O'Don-*

■■■■■■■■■■

*nell* and *Charles E. Moylan, Jr., State's Attorney* and *Deputy State's Attorney,* for *Baltimore City,* respectively, on the brief, for appellee.

PRESCOTT, J., delivered the opinion of the Court.

Maxine Gross, also known as Vicky Storm, was found guilty of murder in the first degree without capital punishment in the Criminal Court of Baltimore by Judges Oppenheimer and Cullen, sitting without a jury, and sentenced to life imprisonment.

The questions presented may be grouped as follows: (1) Was the evidence adduced sufficient to sustain a verdict of first degree murder; (2) Did the trial court erroneously rule that certain evidence seized, without a search warrant, by the police in the appellant's hotel room was not the product of an unreasonable search and seizure; and (3) Did the trial court err in admitting, over appellant's objections, certain other evidence?

On Friday, November 23, 1962, the appellant, through her theatrical agent, Gerald Ray, obtained employment as an exotic dancer at Billie's Show Bar, located at 714 S. Broadway in Baltimore City, owned and managed by Victoria Ludgrove. She worked that evening without anything of importance happening, except a conversation that she had with her employer, which will be discussed later.

The next evening, the appellant reported for work at about 10:00 p.m. Prior to the appellant's arrival, Theo Rosenblatt, also known as Dolly Mack, Steve Vaclovic, and Dr. DeLeon, who had frequented Billie's for the prior six months, were already at the bar. During the course of the evening Dolly Mack introduced the appellant to Dr. DeLeon and the four of them had several drinks together. When the bar closed at 2:00 a.m. on November 25, they left together.

They proceeded to a Chinese restaurant on Park Avenue in Baltimore City in Dr. DeLeon's car, where they had a late meal. Leaving the restaurant at about 3:00 a.m., they proceeded to 30 West Biddle Street, the home of Dolly Mack, where Dolly Mack and Steve Vaclovic left the car. Dr. DeLeon and the appellant proceeded to the Mayfair Hotel, located at Charles St.

and Mount Royal Ave., where the doctor later met his death.

Dr. DeLeon arrived at the hotel and checked in at 3:11 a.m. on November 25, 1962. Immediately after checking in and being shown room 512 on the fifth floor of the hotel, he went back downstairs and joined the appellant at the Stage Door Restaurant, located next door to the hotel. Sometime after 4:00 a.m. that morning, Dr. DeLeon returned to his room at the hotel.

At about 4:30 a.m., the appellant, who lived on the first floor of the hotel, made several attempts to go upstairs to the fifth floor for the purpose of meeting Dr. DeLeon. The night manager of the hotel, the bellhop, and the elevator operator on duty at that time prevented her from doing so, although she protested strenuously. Her protests were so vigorous that the manager of the hotel, Louis Green, who was not on duty at that time but who occupied an apartment in this hotel with his wife, was telephoned by the night manager and was advised of the disturbance that the appellant was causing. Acting on this complaint, he spoke with her on the telephone, demanded that she cease the disturbance, and reminded her of the hotel's policy of not allowing guests to travel between the floors of the hotel for the purpose of visiting other guests.

The appellant again attempted to reach the fifth floor the next morning between 8:00 a.m. and 9:00 a.m., and was once again rebuked by the hotel management. She was not seen by the employees of the hotel on duty on November 25, from 9:00 a.m. until about 4:00 p.m. that afternoon.

At about 3:00 p.m. on that Sunday, Louis Green, the said manager of the hotel, contacted room 512, where Dr. DeLeon was registered, for the purpose of inquiring as to whether the doctor planned to check out or whether he would stay another day. The contact was made by telephone and a male voice answered, informing Mr. Green that he would stay for another day and that he would be down to the desk soon for the purpose of paying the next day's room rent. When Mr. Green did not see Dr. DeLeon within half an hour after the first contact, he again telephoned room 512. This time the telephone rang for approximately one minute with no answer. Thereupon Mr. Green went to the fifth floor personally to check on room

512. He found a "Do Not Disturb" sign on the door and heard the shower running inside the room. Assuming that Dr. De-Leon was taking a shower, he decided to return to the desk in the lobby and to await the doctor's coming down to pay the rent. After another one-half hour wait without seeing Dr. De-Leon, Green again telephoned room 512, and on this occasion a woman answered. Surprised by the woman's voice, Green demanded, "What are you doing up there, you're not supposed to be in [there], there's a man checked in, you are not supposed to be in that room?" The woman replied, "I'll come down and I'll pay you."

Green immediately rushed to the fifth floor, knocked on the door of room 512, and demanded entry. A female voice responded, "I'll come down and pay, I'll come down and pay." When Green smelled smoke coming from the room, his request for entry became more demanding and he warned, "If you don't open the door I am going to call the police." Following this threat, the woman inside the room opened the door to the extent of about 4 inches where the door was caught by a chain latch.

Through the partially opened door, Green caught a brief glimpse of the woman inside the room. Although he was not able to notice her facial features, he saw that she had blond hair similar in color to the wig worn by the appellant from the time that she met Dr. DeLeon at Billie's Show Bar until she was later seen leaving the hotel after his death was discovered. (Her wig was seized, afterwards, in room 122 by the police.) The door was only partially open for just a moment and then was slammed.

Green hurried to the adjoining room, which was vacant at the time, and called the desk, instructing the desk clerk to call the police. After calling the desk clerk, Green heard the door of room 512 open, but by the time he got into the hall to attempt to observe the person who had come out of room 512, the person had gone back in and closed the door. About 8 minutes after making his first call to the desk clerk, Green again called the desk from the adjoining room, at which time he was informed that the police had arrived. He immediately went down to the lobby to meet them.

Officer Petza and Officer Neuman of the Baltimore City Police Department were the first policemen to answer the call, arriving at about 4:12 p.m. They immediately proceeded to the fifth floor on the elevator, and Green opened the door to room 512 with his pass key since by this time the chain latch was off. The room was full of smoke, and after opening the windows of the room for the purpose of clearing the smoke, they found no one there. Looking into the bathroom, they found the body of Dr. DeLeon in the shower stall, wrapped in bed sheets which had been ignited and which were burning. The fire was extinguished by turning on the shower.

There was uncontroverted testimony to the effect that the cause of Dr. DeLeon's death was multiple contusions about his head and body, and from the nature of the blows, the medical examiner, Dr. Fisher, was of the opinion that the weapon used must have been a small blunt instrument of about $1\frac{1}{2}''$ in diameter, and that the blows caused death shortly after they were inflicted. He was also of the opinion that the burns on the body as a result of the fire, in which it was found, were post mortal in nature. The post mortem examination of the victim showed his blood contained no alcohol and that his gastro-intestinal tract indicated no recent intake of food.

It was shown that within a 13 day period prior to the murder, the appellant had been observed on two occasions with a small sledge hammer, otherwise described as a stone mason's hammer or small hand-maul, in her possession. The diameter of its striking face was estimated at about 2 inches and its weight at 1 pound.

Dr. DeLeon's wallet was found along with other of his personal possessions in the shower stall where his body was found. There was no money in his wallet.

Soon after the first police officers arrived at the hotel, the appellant was seen descending the stairway which leads from the lobby to the upper floors of the hotel, at which time she proceeded immediately to her room, being room 112. Gerald Ray, appellant's theatrical agent, who had his office on the same floor of the hotel, met her at her room, almost as soon as she got there. He testified that at this time she smelled of smoke, was flushed in appearance, and very excited. He also stated that

she continually repeated that she had seen something horrible on the fifth floor and mentioned a fire had occurred there. The appellant informed Ray that she intended to move right away and that she didn't want anyone to know her new address. Thereafter she left the hotel. Before leaving the hotel, she had telephoned her attorney, Nelson Kandel, and arranged to meet him at the hotel; however, she actually met him at the drugstore located across the street from the Mayfair.

After speaking with the appellant at her room, Gerald Ray went out to dinner with his wife. Upon his return to the hotel, he met both Lt. Klump and Sgt. Johnson of the police force, who had arrived to investigate the killing. The officers testified that Ray told them that he had been with the appellant in room 122 at about 4:00 p.m., at which time he noticed blood strewn around her room; that there was blood on her clothing; that her hands were cut (Ray was not interrogated as to whether he *told* the police that he had seen blood strewn around the room and on her clothing, and that her hands were cut. He did, however, stoutly, deny that he saw any blood in her room or on her clothing, or that her fingers were cut, when he was in her room. He stated that after his return from dinner and he saw appellant in the hotel lobby her fingers were cut slightly and a few drops of blood were on her suit.) ; her face was flushed; and that she was nervous and smelled of smoke. The officers also testified that Ray told them that the appellant intended to move immediately but that she still was present in room 122.

After talking to Ray, the officers proceeded to room 122 on the first floor of the hotel. They were met by Mrs. Green, the wife of the hotel manager, while they were knocking on the door to room 122, and she advised the officers that the appellant was a very heavy sleeper and often could not be aroused by knocking on the door. After knocking on the door produced no response, Mrs. Green, using a passkey, opened the door and Sgt. Johnson and Lt. Klump, along with Mrs. Green, entered the room. The officers were not in full agreement as to their purpose in entering her room. At the trial they said they were looking for appellant. However, a report made the next day by Sgt. Johnson stated they went into the room "to search for the

murder weapon." In the course of their search, they discovered in plain view, a note which was lying on a desk in the room, which was later introduced into evidence at the trial, and it read as follows:

"1. Be sure that no one can say you went in a hotel room with him.
"2. Be sure his car is paid for, change colors of car, get plates, destroy other plates.
"3. Be quiet when in room, hit him with a hammer over head, put body in tub. Burn until it is destroyed.
"4. Take all papers from body and destroy.
"5. If questioned say nothing. All you say is we went in, we went out to eat and he drove me home and said he had to go somewhere.
"6. Be sure that no hand prints are anywhere.
"7. Be sure take hammer with you, don't forget. Also tell police, please call my lawyer."

They also seized a contract, but it had no significance.

The appellant returned to the hotel at about 6:45 p.m. and was apprehended by police officers who were investigating the killing. Blood stains were visible on the black leatherette suit she was then wearing, and she smelled of smoke. At this time the appellant was asked by the arresting officers whether they could "look around" her room and she replied, "I don't give a damn what you do." In the course of this search (later described in some detail), the police officers took custody of a white leatherette dress and a blond wig, both of which were in the bathtub, a razor with blood stains thereon found in a chest of drawers, blood spattered bed sheets found on the appellant's bed and the suit the appellant was wearing when she was apprehended. On being confronted with the note found in room 122 earlier by the arresting officers, the appellant admitted writing it the night before. She further commented that she wrote this type of note "all the time." The appellant was taken from the hotel to Central Police Station where she was interrogated concerning her involvement in the doctor's death.

438

I

The trial court found that the evidence "indicated" an intention on the part of the appellant to rob the deceased (Code [1957], Article 27, Section 407), but based its decision on the ground that she had wilfully, deliberately and premeditatedly killed the doctor. Code (1957), Article 27, Section 407. It will be unnecessary to repeat here the meaning of the words "wilfully, deliberately and premeditatedly," as we have so recently and so frequently done so before. For a few of the cases so doing, see: *Elliott v. State,* 215 Md. 152; *Faulcon v. State,* 211 Md. 249; *Cummings v. State,* 223 Md. 606. As the case must be remanded for a new trial and the evidence produced by the State at that time may differ from that offered herein, it is preferable, we think, not to repeat here that evidence in detail. Suffice it to say, the State's evidence, as disclosed by the statement of facts above, although some of it was circumstantial in nature, and the reasonable inferences that could be drawn therefrom were ample, under our prior decisions, to support the finding of the trial court.

II

There can be little doubt that formerly in Maryland evidence in a criminal prosecution was admissible even though it had been illegally obtained, in the absence of a statutory or constitutional provision rendering it inadmissible. *Meisinger v. State,* 155 Md. 195; *State ex rel. Georgevich v. Warden,* 207 Md. 632; *Johnson v. State,* 193 Md. 136, 145, 146. And there are many state and federal cases below the Supreme Court level involving questions as to when searches are reasonable because made as an incident to a lawful arrest. See annotations in 32 A.L.R. 680; 51 A.L.R. 424; 74 A.L.R. 1382; 82 A.L.R. 782. And see a collation of Supreme Court cases in 4 L. ed. 2d 1982. However, recent decisions of the Supreme Court, which are binding upon all State courts, make certain aspects of the above mentioned principles clear, and render obsolete all previous decisions at a lower level, which are in conflict therewith; hence it would subserve no useful purpose to discuss them elaborately. In *Mapp v. Ohio,* 367 U. S. 643, the Court overruled *Wolf v. Colorado,* 338 U. S. 25, and flatly held that evidence

obtained as a result of an unreasonable search and seizure could not be used against an accused in a State prosecution. See also *Belton v. State,* 228 Md. 17; *Beale v. State,* 230 Md. 182; and compare *Cleary v. Bolger,* 371 U. S. 392, wherein the Court explains the decision in *Mapp.* We, therefore, must determine whether the evidence taken from the appellant's hotel room to which timely objections were made was lawfully seized. This evidence falls into three categories: (1) the note and the contract which were seized prior to appellant's arrest; (2) the "items of clothing and a wig" which were seized according to the officers, after the appellant had stated she didn't "give a damn what [they did]" in answer to an inquiry if the officers could "look around"; and (3) the suit she was wearing at the time of her arrest, which she took off without protest and gave to the officers.

There is no formula for the determination of the reasonableness of a search; consequently each case must be decided on its own facts and circumstances. *United States v. Rabinowitz,* 70 S. Ct. 430; *Rios v. United States,* 80 S. Ct. 1431. And it is well-established law that a person's hotel room is protected against unreasonable searches. *United States v. Jeffers,* 342 U. S. 48; *Stoner v. California,* 11 L. ed. 2d 856; *Hall v. Warden,* 313 F. 2d 483 (C.A. 4). The searching officers in the instant case were not in complete accord as to their purpose in going into the defendant's room on the first occasion, but it is clear, since they had no search warrant, that the articles seized therein to be admissible in evidence must come within one of the exceptions to the general rule that a search to be reasonable must be made as a result of a valid search warrant. *Stoner v. California, supra; Preston v. United States,* 11 L. ed. 2d 777.

The trial court held that the officers making the search had "reasonable cause" to believe a "felony had been committed and that the person for whom [they were] searching committed that felony," and they therefore had a "right to make the search." [1] We are not here considering the legality, *vel non,*

1. In Stoner v. California, supra, the District Court of Appeals adopted the same approach (see footnote 3), but this approach was rejected by the Supreme Court under the circumstances of that case. (11 L. ed. 2d at p. 859.)

of appellant's *arrest;* we are considering whether the *searches* of her room prior to and after her apprehension were reasonable, when measured by constitutional standards as laid down by the Supreme Court. For, even if we assume that the police had "probable cause" to *arrest* the appellant at the time they entered her room and had a right to enter her room to *arrest* her, we have found no case, nor have we been referred to any, holding that "probable cause" to *arrest* a suspect justifies a *search* of his or her home or hotel room in his or her absence when no *arrest* has been made prior to the search, or so shortly thereafter as, under the circumstances, to render the arrest and search substantially contemporaneous as to time and place.

It needs no citation of authority to assert that when a person has been lawfully arrested, the police have a right, without a search warrant, to make a contemporaneous search of the person of the accused for weapons or for the fruits of, or implements used to commit, the crime. And this "right to search and seize without a warrant extends to things under the accused's immediate control [citation], and, to an extent depending upon the circumstances of the case, to the place where he is arrested, [citations]." *Preston v. United States, supra.* The Court in that case went on to state clearly the reasons that justify this exception to the general rule: "* * * the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as * * * the need to prevent the destruction of evidence of the crime * * *." (11 L. ed. 2d at p. 780.) See also *Stoner v. California, supra.*

We think that our decision is controlled by the *Stoner* and *Preston* cases, both *supra.* In *Stoner* a defendant was charged with armed robbery in California. The Court admitted into evidence, over timely objections, several articles discovered and seized by police officers, who, without a search warrant, searched his hotel room during his absence with the consent of the hotel clerk. The hotel room was located in Pomona, California, and, two days after its search, the defendant was arrested in Las Vegas, Nevada. The Supreme Court, unanimously, reversed his conviction on the ground that the search was unlawful because not warranted as an incident to a lawful arrest, the search being unrelated to the arrest as to time and place, and it was not

made lawful by the hotel clerk's consent. The Court pointed out that "a search can be incident to an arrest only if it is substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest. *Agnello v. United States,* 269 U. S. 20."

Again in *Preston, supra,* the Supreme Court, unanimously, reversed a conviction based largely upon evidence obtained as a result of a search by police officers of an automobile shortly after the defendant had been arrested and taken to police headquarters. The defendant was in the vehicle at the time of his arrest, but it had been removed to a garage. The Court stated the reasons (as we pointed them out above) that justify a search as an incident to a lawful arrest, assumed that a search of the car would have been lawful when the defendant was first arrested, and went on to state that at the time of the search there was no danger of the accused (or his companions) using any weapons in the car, they could not have destroyed any evidence of the crime contained in the automobile, nor was there any danger of the car being moved out of the locality; hence the search was too remote in time and place to be considered reasonable because of being incidental to a lawful arrest.

These cases and the instant case differ from *Ker v. California,* 10 L. ed. 2d 726. There police officers, had probable cause to believe that they had seen Ker receive narcotics a short time before, and had followed him a part of the way to his living quarters but lost him in traffic, entered his living quarters to arrest him, after observing his car parked outside. Upon their entry, narcotics were in plain view and were seized by the police. The Supreme Court held there was no error in admitting the narcotics.

We proceed to a consideration of the individual items of evidence (properly objected to below), which were briefed and argued by the appellant in this Court—first the note and the contract. As indicated above, the record fails to disclose with accuracy the time of appellant's arrest (Sgt. Johnson said she was arrested at about 6:45 p.m.; Lt. Klump stated she was being "held for investigation.") However, it was shown that the arresting officers arrived at the hotel at about 4:10 p.m. (other officers had arrived earlier), and, after seeing the body

of the deceased and talking with Ray, they proceeded to her room, probably not later than 4:45 p.m., where, in her absence, the note and the contract were seized. According to the officers, the appellant did not return to the hotel until about 6:30 to 7:00 p.m., and she was placed under arrest sometime thereafter; so the seizure of the note and contract had to precede the arrest by some one and one-half to two hours.[2] When the police entered her room before her arrest and saw she was not therein, there was no danger that she nor anyone else could destroy any evidence of the crime in the room. There was no urgency present. Consequently, none of the reasons for permitting a search and seizure incident to a lawful arrest was present when the note and contract were seized. As stated in *Hall v. Warden, supra*: "There is no showing of urgency, or that an immediate search might have been justified by a possibility that anything in Hall's room would disappear. On the contrary, it would have been a simple matter to post a guard at the hotel room door and attempt to obtain a lawful warrant."[3] We hold that the search of appellant's room and the seizure of the note and contract and her subsequent arrest were not substantially contemporaneous; therefore, neither the note nor the contract should have been admitted into evidence. *Stoner v. California; Preston v. United States,* both *supra.* The contract had little, if any, significance; so its admission was harmless error.

---

2. For general and instructive discussions on searches and seizures, see Biddison, "A Review of the Maryland Law on Search and Seizure," Daily Record, April 23, 1945; 1 Varon, Searches, Seizures and Immunities pp. 191 et seq.; Kaplan, "Search and Seizure: A No-Man's Land in Criminal Law, 49 Cal. L. Rev. 474; "Limitations on Seizure of 'Evidentiary' Objects" 20 University of Chicago L. Rev. 319.

3. In the above case, Hall, prior to his arrest, told the police the hotel in which he lived and gave them the number of his room, and voluntarily accompanied the police in their automobile to the hotel, where Hall remained in the car. The police searched his room without a warrant, and seized certain articles which were admitted into evidence. The Court granted Hall a new trial, holding that the search of his hotel room and the seizure of evidence therein were illegal, and the evidence obtained as a result thereof should not have been admitted.

But the note, obviously, was highly damaging in nature; consequently its admission was prejudicial error.

This brings us to a consideration of the evidence in category (2)—these items consisted of a white leatherette dress and a blond wig, both found soaking in the bath tub, and some bed clothing with blood spots thereon removed from her bed. (There were a few other items seized at that time, but appellant did not object to or argue the question of their admissibility in her brief. Maryland Rule 831 d 2 and 4 and c 2 and 4.) We think it unnecessary for us to attempt to determine the precise scope of *Stoner*, and to decide whether this evidence was admissible as having been obtained as an incident to a lawful arrest. There was evidence with regard to consent to the search, which was uncontradicted and uncontroverted.

This evidence was, in brief, as follows. The police testified that they asked appellant after her apprehension if they could "look around," to which she replied that she didn't "give a damn" what they did. She then accompanied them to her room and was looking for her key to admit them, when Mrs. Green, the manager's wife, volunteered to the appellant that she (Mrs. Green) would use her pass key. Upon entering the room, the police stated appellant was again asked if she objected to their "looking around," and they received the same reply as before. It is established law that a search by permission of the person entitled to constitutional protection from unreasonable searches is lawful as one of the exceptions to the general rule that reasonable searches must be made as the result of valid search warrants. *Heyward v. State,* 161 Md. 685; *Armwood v. State,* 229 Md. 565; 1 Varon, *Searches, Seizures and Immunities,* pp. 226-232. The above consent of the accused clearly rendered the search for, and seizure of, the evidence reasonable as being a search and seizure by permission; hence it becomes unnecessary to determine whether it was also admissible as having been obtained as the result of a search and seizure incidental to a lawful arrest.

With reference to category (3)—the black leatherette suit worn by appellant when arrested—this item gives us little difficulty. The uncontroverted testimony shows that appellant voluntarily took this suit off (in the presence of the officers)

and gave it to them. And, in addition, the item was actually introduced by the appellant (as well as by the State) as an exhibit in the case. There was no error in admitting the suit.

## III

Under this heading, appellant objects to several portions of the testimony, which we will now consider. Sgt. Johnson was permitted to testify that appellant admitted that she was the author of the note found in her room and discussed above. Since we hold that the note was improperly admitted, the question of authorship will not re-occur on remand.

On the first night that appellant reported for work at Billie's Show Bar, (the Friday preceding the Sunday on which the doctor was killed) she had a conversation with her employer, a Mrs. Ludgrove. Upon entering the Bar and noticing there were only two patrons present, appellant inquired of her employer, "What's [wrong] with this place?" The employer asked what she meant, and appellant replied, "There's nobody here." The employer told her it was early and "things will pick up later." Whereupon appellant asked, "Well, can I do any good around here * * * do you have any live wires come in here." She explained that "live wires" meant men with money, and when the employer asked appellant what she would do with them, she stated, "I would take them to my hotel and let them get a room, and then I would later visit them." There was no error in admitting this testimony. The conversation occurred very shortly before the doctor's demise. If believed by the triers of fact, it tended to show that appellant wanted money or articles of value, a possible motive for killing the doctor. Moreover, it tended to establish a consciousness on the part of appellant of a course of conduct which the State contended was actually pursued by the appellant; namely, having the doctor register at her hotel and later visiting him at his room. Compare *Pearson v. State,* 182 Md. 1, 13, and *Westcoat v. State,* 231 Md. 364, 367.

During the late meal in the early morning hours of the day the doctor was killed, Theo Rosenblatt testified that she did not recall how the subject came up, but she and the appellant had a conversation in which appellant "mentioned she had done

quite a bit, quite a few things in life" and the witness replied that she had too. Appellant further inquired, "For money?" and the witness stated, "Well, for money." Then the appellant asked, "Well, have you ever robbed?" No objection was made to this testimony and, ordinarily, we would not pass upon its admissibility, but, as the case must be remanded, we deem it desirable to do so, Maryland Rule 885.

The testimony was, we think, properly admitted. The conversation took place very shortly before the killing. It was the State's theory that the appellant had lured the doctor to her hotel for the purpose of killing him, taking whatever money he had upon his person, and obtaining his automobile. It was part of a chain of evidence which tended to establish that appellant was "money conscious," and that she might resort to robbery to acquire things of value. As stated in *Pearson v. State, supra*: "The real test of admissibility is the connection of the fact proved with the offense charged, as evidence which has a natural tendency to establish the fact at issue should be admitted." We think the conversation, when considered with the other evidence adduced, had a "natural tendency" to establish robbery as the motive of the doctor's killing.

Appellant also questions the admissibility of testimony to the effect that she had in her possession, about the middle of November, a small sledge hammer or hand maul. The question presents little difficulty. Possession by the appellant of a hammer of the size and weight as described by the witnesses, when considered with the testimony of Dr. Fisher as to the type of weapon which, in his opinion, caused the mortal wounds inflicted upon the deceased, was highly pertinent as tending to establish appellant's probable participation in the doctor's death.

Appellant's last assignment of error disputes the admissibility of testimony which established ownership in the deceased of a new automobile purchased a short while before his death. Again there was no error. It was relevant, under the State's theory of the case that the acquisition of the car by the appellant was a part of the motive for the killing, to show that the doctor owned the automobile.

> *Judgment reversed, and case remanded for a new trial.*

446

HAMMOND, J., filed the following dissenting opinion.

Trained and accustomed to expect a particular result from a given set of circumstances, many State appellate judges have been traumatically frustrated on Monday after Monday in recent years as decision after decision of the Supreme Court, in its inexorable march towards complete federalization of the criminal law in this country, has overturned established law and made, what not long ago would have been thought almost fantastic, new law.

As a result, State appellate courts have tended to become conditioned to anticipate that each new decision of the Supreme Court in the criminal field is a forerunner of decisions even more startling and far-reaching, from their point of view, and so, in a sort of hypnotic desperation, to fashion their own opinions and holdings to reflect not only what already actually has been held (as in duty and good conscience they must and should) but what they imagine or suspect soon will be held.

The result in the present case in this Court can be explained, it seems to me, only on this theory and, as I see it, there is not only no necessity to reverse a sound and fairly obtained conviction of guilt in a brutal and senseless murder but an affirmance is called for by the present holdings of the Supreme Court (including *Ker v. California*, 374 U. S. 23, 10 L. Ed. 2d 726, which, unlike the Supreme Court cases supposed by the majority to control, has quite analogous facts) and many other courts in order to avoid a miscarriage of justice from the point of view of society.

The majority of the five judges of this Court who heard the appeal said: "[w]e think that our decision is controlled by the *Stoner* [*Stoner v. California*, 376 U. S. 483, 11 L. Ed. 2d 856] and *Preston* [*Preston v. United States*, 376 U. S. 364, 11 L. Ed. 2d 777] cases." Neither of these cases purported to or did make new law. In *Stoner* the holding was that a hotel clerk cannot give consent for the absent lessee of a hotel room to the search of that room. The police learned two days after a robbery in Monrovia, California, that a suspect had been living in a hotel in Pomona. They went to the hotel, without either a search or arrest warrant, told the clerk they had come to ap-

prehend a man "who had possibily committed a robbery in the City of Monrovia and were informed that the suspected individual had been occupying room 404 but that he was out and that the clerk knew he was out. Then the police were admitted to room 404 by the clerk who said to them "be my guest" and made a thorough search of the room and its contents, finding a pair of glasses, a gray jacket and a .45 caliber automatic pistol in the bottom of a bureau drawer. The suspect was arrested two days after the search in Las Vegas, Nevada, and returned to stand trial in California. At his trial the articles seized in his room were admitted against him.

The Supreme Court noted that although the District Court of Appeal had reasoned and held that the search was justified as an incident of a lawful arrest, and said that in brief and argument before it California had abandoned and renounced this contention and relied only on the point that the consent of the hotel clerk to the search of Stoner's room amounted to consent by Stoner. The Court said (pp. 487-488) :

> "In this Court the respondent has recognized that the reasoning of the California District Court of Appeal cannot be reconciled with our decision in *Agnello,* nor, indeed, with the most recent California decisions. Accordingly, the respondent has made no argument that the search can be justified as an incident to the petitioner's arrest. Instead, the argument is made that the search of the hotel room, although conducted without the petitioner's consent, was lawful because it was conducted with the consent of the hotel clerk. We find this argument unpersuasive."

The Supreme Court went on to point out that the implied consent theory was not the law of California. In its obiter discussion of the "incident to arrest" theory, the Court said this (pp. 486-487) :

> "The District Court of Appeal thought the search was justified as an incident to a lawful arrest. But a search can be incident to an arrest only if it is substantially

contemporaneous with the arrest and is confined to the immediate vicinity of the arrest. *Agnello v. United States,* 269 U. S. 20. *Whatever room for leeway there may be in these concepts,* it is clear that the search of the petitioner's hotel room in Pomona, California, on October 27 was not incident to his arrest in Las Vegas, Nevada, on October 29. *The search was completely unrelated to the arrest, both as to time and as to place.* See *Preston v. United States,* [376 U. S. 364]." (Italics supplied.)

The holding of *Preston* was that after three occupants of a car had been arrested for vagrancy, searched for weapons and taken to police headquarters, the car which had not been searched at the time of the arrest was driven first to a police station and then towed to a garage. Sometime later it was searched and various items intended to be used to rob a bank named by the men were found and seized. In the trial of the men in a federal court for conspiracy to rob a federally insured bank, the articles taken from the car were admitted into evidence over objection. The Supreme Court held this to have been prejudicial error. The Court said:

"Unquestionably, when a person is lawfully arrested, the police have the right, without a search warrant, to make a contemporaneous search of the person of the accused for weapons or for the fruits of or implements used to commit the crime. *Weeks v. United States,* 232 U.S. 383, 392 (1914); *Agnello v. United States,* 269 U.S. 20, 30 (1925). This right to search and seize without a search warrant extends to things under the accused's immediate control, *Carroll v. United States, supra,* 267 U.S., at 158, [the Court had earlier said of Carroll: "Our cases make it clear that searches of motor cars must meet the test of reasonableness under the Fourth Amendment before evidence obtained as a result of such searches is admissible."] and, to an extent depending on the circum-

stances of the case, to the place where he is arrested, *Agnello v. United States, supra,* 269 U.S., at 30; *Marron v. United States,* 275 U.S. 192, 199 (1927); *United States v. Rabinowitz,* 339 U.S. 56, 61-62 (1950). * * * Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest. *Agnello v. United States, supra,* 269 U. S., at 31. Here, we may assume, as the Government urges, that, either because the arrests were valid or because the police had probable cause to think the car stolen, the police had the right to search the car when they first came on the scene. But this does not decide the question of the reasonableness of a search at a later time and at another place. * * * We think that the search was too remote in time or place to have been made as incidental to the arrest and conclude, therefore, that the search of the car without a warrant failed to meet the test of reasonableness under the Fourth Amendment, rendering the evidence obtained as a result of the search inadmissible." (pp. 367-368)

The majority of the Court in the present case refer to the rule that the police after a lawful arrest may, without a warrant, search the arrested person and the place where he was arrested, but they feel impelled by Stoner and Preston—erroneously I think the analyses of the cases have shown—to find it inapplicable. Even if the majority were right in this, a corollary of the rule is directly apposite here.

The facts of the instant case fit like a glove that recognized and well established corollary which the majority reject and say "no case" supports. This corollary has two aspects. First, if a peace officer is justified in making an arrest, the fact that the search and seizure precedes rather than follows the arrest is immaterial and, second, the privilege to make an arrest for a criminal offense carries with it the privilege to enter a dwelling place (forcibly if necessary) for the purpose of making the arrest if the person sought is therein, or if the arrestor reason-

450

ably believes him to be there (*Restatement, Torts,* Secs. 204, 205, 206; Kauffman, *The Law of Arrest in Maryland,* 5 Md. L. Rev. 125, 167) and in such case the officer is not a trespasser, and after such a bona fide entry may make a search and effect a seizure, after a valid arrest or even if there is no arrest (usually because the person sought turns out not to be in the dwelling place).

Judge Traynor said for the Supreme Court of California in *People v. Simon,* 290 P. 2d 531, 533, in speaking of a justified entry by police: "the security of * * * [one's] person, house, papers, or effects suffers no more from a search preceding his arrest than it would from the same search following it." See also *Wilson v. Superior Court* (Cal.), 294 P. 2d 36, 38; *People v. Vice* (Cal. App.), 305 P. 2d 270 (Peace officers having cause to do so went to make an arrest of a suspect at his hotel and, thinking he was in his room, caused the clerk to let them in. The suspect was not in his room but narcotics were found there. The police arrested the suspect a half hour later at another location. The search and seizure were held reasonable and valid.) ; *People v. Dillard* (Cal. App.), 335 P. 2d 702; *State v. Chinn* (Ore.), 373 P. 2d 392 (Officers, in an honest belief that a man they were entitled to arrest was in an apartment, entered and, finding him absent, made a search which revealed incriminating articles. The officers waited in the apartment for several hours and when their quarry returned arrested him. The search and seizure were held reasonable and valid because made in an area in which the officers had a right to be; they were in the apartment in a bona fide attempt to make an arrest [and were not making an exploratory search under the guise of a search incident to arrest] and the search was an incident of the attempt and as reasonable under the circumstances as if it followed a lawful arrest.) ; *People v. Roberts* (Cal.), 303 P. 2d 721; *State v. Peterson* (Ida.), 340 P. 2d 444; *Martin v. United States* (C. A. 4), 183 F. 2d 436, *cert. den.* 340 U. S. 904 (Judge Soper, for the Court, held that an officer having probable cause to make an arrest of a probationer for a current violation of law had the authority to enter the probationer's premises without any warrant, to make an arrest and, therefore, had

authority to make a search and seizure without making any arrest—the probationer was told to come to Court the next day —because the test is not the lack of a warrant or the failure to procure one but reasonableness of the search under all the circumstances which, in that case, said Judge Soper, "cannot be distinguished, on any reasonable basis, from the search of the premises of an accused as an incident to the lawful arrest of his person." [p. 439]) ; *United States v. Joines* (C. A. 3), 258 F. 2d 471, *cert. den.* 358 U. S. 880 (The Court of Appeals for the Third Circuit affirmed the trial court's holding that a still, mash and "nontax-paid" liquor found by officers in a house, entered by virtue of a warrant of arrest, during a quest for the suspect named in the warrant, which was unsuccessful because he was not then in the house, were admissible into evidence. [See 246 F. 2d 278.] The Supreme Court granted certiorari, vacated the judgment of affirmance and remanded the case for further consideration in the light of *Jones v. United States,* 357 U. S. 493, 2 L. Ed. 2d 1514. [*Jones* held that probable cause to believe that a house contained contraband did not justify a search of the house without a warrant.] On remand, the Court of Appeals gave "the most careful consideration" to the Supreme Court's opinion in *Jones* and again affirmed the trial court. Judge Maris, for the Court, said at p. 472 :

> "In the case before us, however, the facts as found by the trial judge, with which finding we agree, are that the officers searched the defendant's dwelling house in a bona fide attempt to find and arrest him and that they did not know of, or even suspect, the existence of the still, mash and liquor in the dwelling house until they came upon it in the course of their search for the defendant. This, then, is the case which the Supreme Court took pains to point out that the Jones case was not, and it falls within the exception to the rule requiring a search warrant which the court in that case expressly pointed out, namely, a 'search incident to a valid arrest.'
>
> "The fact that the defendant could not be found in his dwelling house did not render the presence of the

officers there unlawful since they entered armed with a warrant which they were endeavoring in good faith to execute. And being lawfully in the house they were entitled to seize the illicit articles which met their eyes. Accordingly, the fact that no arrest actually then took place is immaterial. Indeed, if that were the decisive factor there would have been no purpose in remanding the case to us for further consideration. On the contrary, the Supreme Court, had it thought this undeniable fact controlling, would certainly have reversed the defendant's conviction."

After the second affirmance of the trial court by the Court of Appeals, the Supreme Court denied certiorari.) ; cf. *Chapman v. United States,* 365 U. S. 610, 5 L. Ed. 2d 828, where a search of a rented house in the absence of the tenant with the landlord's consent—access having been gained through a window — was held to be an unreasonable search; *Bushy v. United States* (C. A. 9), 296 F. 2d 328, 332, *cert. den.* 369 U. S. 876; *Ellison v. United States* (C. A. D. C.), 206 F. 2d 476. See also Annotation, *Lawfulness of Nonconsensual Search and Seizure without Warrant, Prior to Arrest,* 89 A. L. R. 2d 715.

The authorities make it plain that a search prior to arrest is reasonable and constitutional if it is incident to an entry into premises for the bona fide purpose of making a justified immediate arrest therein, and that a search prior to arrest is unreasonable and unconstitutional if it is for the real purpose of making an exploratory search, even if that search is sought falsely to be justified as incident to a legal arrest.

In the instant case the evidence can leave no real doubt that the officers had entered the appellant's hotel room with the real, express and justified purpose of arresting her, honestly believing her to be in the room and to be contemplating flight. After gaining entry, for this purpose, they searched the room and bathroom to see if Maxine Gross was there and found she was not. In the course of the search of her quarters, the police observed blood spots on the sheets on the bed, and in the bathtub, about a third full of "pinkish" water, a blond wig (which the police then knew the suspect often wore), and a white dress.

The officers did not then disturb these articles. On the bed was a contract of employment at a nightclub, bearing the name of the suspect, and on a desk in plain view was a letter written in red ink which told of how a crime like that which the occupant of the room was thought to have committed could be committed, and how its commission could be concealed.

The police certainly were justified, after their lawful entry, in observing what was in plain view and taking into possession the incriminating note, which was a part of the means of the crime. Maryland has long adhered to the view that as incident to a lawful arrest any tangible evidence of the crime may be seized—whether classified as "means," "fruits," "weapon for escape," or "contraband." *Matthews v. State*, 228 Md. 401; *Shorey v. State*, 227 Md. 385; *Lucich v. State*, 194 Md. 511; *Griffin v. State*, 232 Md. 389, 393. This is not an unusual rule. 4 *Wharton's Criminal Law and Procedure* (1957 ed.), Secs. 1538, 1569; 47 Am. Jur. *Searches and Seizures* Sec. 54.

*Ker v. California*, 374 U. S. 23, 10 L. Ed. 2d 726, not only is controlling on the main merits but it makes plain that the Maryland rule is constitutionally permissible. There, eight members of the Supreme Court agreed that *Mapp v. Ohio*, 367 U. S. 643, 6 L. Ed. 2d 1081, did not establish assumption by the Supreme Court "of supervisory authority over state courts * * * and, consequently, it implied no total obliteration of state laws relating to arrests and searches in favor of federal law." (p. 31) The eight justices also said:

> "We reiterate that the reasonableness of a search is in the first instance a substantive determination to be made by the trial court from the facts and circumstances of the case and in the light of the 'fundamental criteria' laid down by the Fourth Amendment and in opinions of this Court applying that Amendment * * *. The States are not thereby precluded from developing workable rules governing arrests, searches and seizures to meet 'the practical demands of effective criminal investigation and law enforcement' in the States, provided that those rules do not violate the constitutional proscription of unreasonable searches and seizures * * *." (pp. 33-34)

Four members of the Court, including Mr. Justice Black (Justice Harlan concurred in the result), held that police officers who had probable cause to believe that the occupant of an apartment was a felon, and was then in the apartment, did not violate either California law or the federal constitution when they entered the apartment to arrest the occupant by means of a key obtained from the manager of the apartment house (even if such entry be deemed the legal equivalent of a "breaking") and could lawfully seize marijuana observed in the apartment. They noted also that "the practicability of obtaining a warrant is not the controlling factor when a search is sought to be justified as incident to arrest." (p. 41)

The appellant contended that the seizure could not be reasonable since it preceded the arrest. The Court said at pages 42-43:

> "This contention is of course contrary to George Ker's testimony, but we reject it in any event. While an arrest may not be used merely as the pretext for a search without warrant, the California court specifically found and the record supports both that the officers entered the apartment for the purpose of arresting George Ker and that they had probable cause to make that arrest prior to the entry. We cannot say that it was unreasonable for Officer Berman, upon seeing Diane Ker emerge from the kitchen, merely to walk to the doorway of that adjacent room. We thus agree with the California court's holding that the discovery of the brick of marijuana did not constitute a search, since the officer merely saw what was placed before him in full view. *United States v. Lee,* 274 U. S. 559 (1927); *United States v. Lefkowitz,* 285 U. S. 452, 465 (1932); *People v. West,* 144 Cal. App. 2d 214, 300 P. 2d 729 (1956). Therefore, while California law does not require that an arrest precede an incidental search as long as probable cause exists at the outset, *Willson v. Superior Court,* 46 Cal. 2d 291, 294 P. 2d 36 (1956), the California court did not rely on that rule

and we need not reach the question of its status under the Federal Constitution."

I can see no unconstitutional or unreasonable search and seizure of the contract and the note under the facts of the instant case. As the Court said in *State v. Chinn, supra* (at pp. 397-398 of 373 P. 2d) :

"If the police may not look at visible objects or glance around the room until after they have arrested the accused, then law enforcement has been turned into some sort of a game. We think the essential point is whether the police have made an unlawful exploratory search, or incidentally, and reasonably, have observed evidence found while on the premises to make the arrest."

See *Silverstein v. State,* 176 Md. 533, and *Heyward v. State,* 161 Md. 685.

The majority holds that it is unnecessary to decide whether the entry of the police into the room of Miss Gross after they arrested her when she returned to the hotel an hour and a half or so after they first entered the room and their seizure of the blood stained sheets, the wig, and the dress which they had observed on their first entry, was unreasonable. The room of Miss Gross was on the same floor as the lobby where she was arrested and was under her immediate control. This being so, the seizure was justified even without her consent. In summarizing the law it is said in Diamond, *Arrest, Search and Seizure* (published in 1963 by the Department of Political Science and Administration of the Los Angeles State College) (at p. 65), "[i]n an arrest made in an entry hall or lobby, the defendant's apartment or room in the same building may be searched." *People v. Aleria,* 14 Cal. Rep. 162, *cert. den.* 374 U. S. 832, 10 L. Ed. 2d 1055, in which the Court, citing many cases in support, held that a search of defendant's hotel room up one flight of stairs and some twenty to thirty feet down the hall immediately after his lawful arrest in the lobby of a hotel, was not unreasonable. To the same effect see

*United States v. Seltzer* (D. C. Mass.), 5 F. 2d 364, 365, in which it was said that after a lawful arrest there may be a search of the accused's person and property "even to the extent of searching the building in which the crime was committed as far as controlled by the offender." See also *Sayers v. United States* (C. C. A. 9), 2 F. 2d 146; *United States v. Charles* (D. C. Cal.), 8 F. 2d 302; *Rucker v. State,* 196 Md. 334.

The search could be justified on either the theory that it was incident to a lawful arrest in point of time and place and of a place under the actual control of the accused, or that there was consent to the search, or both.

I would affirm the judgment and sentence.