## CRAIG HENRY FELLOWS *v.* STATE OF MARYLAND

[No. 334, September Term, 1970.]

*Decided October 21, 1971.*

The cause was argued before MURPHY, C. J., and AN-DERSON and MORTON, JJ.

*David B. Allen* for appellant.

*Gary Melick, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Sandra A. O'Connor, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ANDERSON, J., delivered the opinion of the Court.

Appellant, Craig Henry Fellows, was tried in the Criminal Court of Baltimore by a jury under two indictments charging him with the murder and armed robbery of Joseph Eugene Wilson, same being Indictments Nos. 3955/69 and 3956/69. He was found guilty of robbery with a deadly weapon (Indictment No. 3956—first count), and sentenced to twenty years under the jurisdiction of the Department of Correctional Services. The jury was unable to agree on a verdict under Indictment No. 3955 (murder in the first degree), and a mistrial was declared.

Prior to trial appellant filed a motion to suppress the State's evidence concerning a pair of bloodstained trousers found in appellant's apartment; and to suppress all statements and/or confessions taken by the police from the appellant following his arrest on the grounds that they violated the principles enunciated in *Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602. A full evidentiary hearing was held by the trial court on the motions to sup-

press before the jury was selected and at the conclusion of the hearing the trial judge held that all of the statements made by the appellant after his arrest were admissible in evidence and that the State's evidence as to the finding of a pair of bloodstained pants in appellant's apartment was also admissible. All motions to suppress were denied by the trial court.

From the testimony adduced at the trial it was shown that on June 7, 1969, shortly after 9:30 a.m., Joseph Eugene Wilson, owner of Wilson's restaurant at North and Pennsylvania Avenues, in Baltimore, was assaulted and robbed as he was about to enter his second floor office above the restaurant with a bag of money containing the previous day's receipts. Shortly after Wilson had left the restaurant a noise was heard on the second floor. Joseph Blount and two women employees of Wilson came out of the restaurant to investigate. At that time they observed appellant coming down the stairs from the second floor. Upon being asked what was the noise, appellant replied that he and his brother-in-law, Haywood Simon, had been in a scuffle. He then turned and went back up the stairs and the employees returned to the restaurant. Shortly thereafter, Wilson's blood soaked body was found on the second floor landing outside his office door by an employee, Joseph Blount, who was bringing up his breakfast. The office door was unlocked, his keys were on the floor, and the money bag was gone. An ambulance was called and he was removed to the hospital where he was pronounced dead. The autopsy disclosed that he died of multiple stab wounds which penetrated his left lung, his aorta, his spleen and caused extensive bleeding of both the chest cavity, the abdominal cavity and on the tissues behind the abdominal organs in the body wall. His blood type was shown to be Group A.

I

Appellant first contends that the trial court erred in denying appellant's motion to suppress the State's evidence concerning a pair of bloodstained pants found in

the closet of appellant's third floor apartment shortly after the commission of the crime. He argues that there was an illegal search since it was made without a warrant, and therefore the evidence as to the bloodstained pants found therein was improperly admitted.

Officer Bernard Brauner, Baltimore City Police Department, testified that at 10:34 a.m. he, together with Officer Sharpley, responded to a call to Wilson's restaurant. Upon arrival they were directed to the second floor landing. There they observed a large pool of blood outside the office door, with bloody footprints and a trail of blood leading up the stairs to the third and fourth floor apartments. Observing that the outside windows were closed and suspecting that Wilson's assailant was still in the building, they first went to the fourth floor apartment occupied by Mr. and Mrs. Haywood Simon. After knocking, the Simons, who were still in their bed clothes, came to the door but upon questioning they denied hearing any disturbance. The officers then returned to the third floor where the blood trail led to the third floor apartment, the door of which was partially open. After knocking, they entered the apartment and searched to see if anyone was hiding. The search revealed the apartment was empty but Brauner observed a pair of bloodstained pants on a hanger in the closet. The officers immediately returned to the fourth floor apartment where, with the Simons' permission, they searched the apartment but without success.

We are of the opinion that the warrantless search of appellant's apartment comes within the ambit of *Warden, Maryland Penitentiary v. Hayden,* 387 U. S. 294, 87 S. Ct. 1642, where the United States Supreme Court held that "neither the entry without a warrant to search for the robber, nor the search for him without a warrant was invalid. Under the circumstances of this case 'the exigencies of the situation made that course imperative.' " Here we have a similar situation. The officers had good reason to believe that Wilson's assailant was still

in the building, and they entered the apartment for the sole purpose of locating and apprehending him. In the course of the search, the officer looked inside the closet where, in clear view, he observed the bloodspotted pants. The trial judge made his ruling clear that this evidence seen in the search was based upon "hot pursuit" and the evidence was admitted on that basis. See also *Frager v. United States*, 258 A. 2d 259 (D.C.) at 260.

Appellant relies upon *Gross v. State*, 235 Md. 429. However, in *Gross*, there was no emergency or "hot pursuit." Some 35 minutes had elapsed from the time the officers arrived at the scene before they proceeded to Mrs. Gross' room. Also there was reason to believe the room was vacant. The court held that when the police entered her room and found it vacant they had no reason to make a complete search and seize the incriminatory note and various articles. The Court found that there was no urgency and it would have been a simple matter to place a guard at the hotel room door and obtain a lawful warrant. In so holding, the majority relied upon *Stoner v. California*, 376 U. S. 483, and *Preston v. United States*, 376 U. S. 364, the facts in which were in no wise similar to the facts in the instant case. We find that the lower court properly overruled the motion to suppress and that the evidence as to the bloodstained pants was properly admitted.

## II

Appellant next contends that the trial court erred in denying appellant's motion to suppress four statements made by the appellant to the police following his arrest because each statement violated the principles enunciated in *Miranda v. Arizona, supra,* and because the third and fourth statements were also involuntary as resulting from an inducement and that they violated due process of law.

### FIRST STATEMENT

Detective Nicholas Caprionola of the Baltimore City

Homicide Squad testified that he was conducting an investigation at the crime scene together with Detective Chlan and Sergeant Nevin when at approximately 11:45 a.m. appellant was observed coming up the fire escape. As he came through the third floor window he was placed under arrest by Caprionola who observed blood on the bottoms of his tennis shoes. Upon placing appellant under arrest Caprionola, in the presence of Detective Chlan, orally advised appellant "that he had the absolute right to remain silent, that anything he said or wrote could be used against him in a court of law, that he had the right to consult a lawyer before any questioning, in the presence of a lawyer before answering any questions, that if he wanted a lawyer and could not afford to hire one the State would provide one for him, and that if he agreed to make a statement and changed his mind and requested a lawyer he could have one at that time."

Appellant said that he understood his rights and did not wish an attorney but wanted to know why he was being arrested. Upon being told that it was in connection with the homicide of Mr. Wilson, he said he didn't have anything to do with it and did not know anything about it, that he had been out purchasing records. He was not questioned but was taken to the Western District Police Station and placed in the cellblock.

We find no violation of *Miranda* involved in the alleged first statement made by appellant. The oral warnings given him were sufficient. Moreover, we are of the opinion that the statement voluntarily given by appellant at the time of his arrest did not come within the purview of *Miranda* since the statement was volunteered and not given in response to any questioning. See *Richardson v. State,* 6 Md. App. 448 at 452.

## SECOND STATEMENT

Appellant contends that a second statement given by him to the police was inadmissible because the principles of *Miranda* were violated. According to Detective Capri-

onola's testimony, appellant was taken to the Western District at 12:10 p.m. Around 6:00 p.m. he was brought up from the cellblock for questioning. Present were Detectives Caprionola and Chlan and Officer Brauner.

Appellant argues that the trial court should not have admitted appellant's second statement into evidence since Caprionola's testimony was so confused as to the series of events leading up to the second statement that the trial court was unable to make a determination as to which version was the correct one and therefore, under the circumstances, the State had not met its heavy burden of proving that the appellant understood his right to remain silent since the oral statement was given prior to the signing of the waiver form.

Caprionola testified, and the lower court found as a fact, that prior to any questioning appellant was advised of his *Miranda* rights from an explanation of rights form introduced in evidence as State's Motion Exhibit No. 5.[1] Appellant then read the explanation of rights form, stated he understood his rights as set forth in the form, and agreed to make an oral statement. He stated orally

---

1. The Explanation of Rights forms referred to herein read as follows:

"I have been advised by [Name, Rank & Sequence No.] of my rights and I understand:

1. That I have an absolute right to remain silent.

2. That anything I say or write may be used against me in a court of law.

3. That I have the right to consult a lawyer before any questioning and to the presence of a lawyer before answering any questions or at any time while being questioned.

4. That if I want a lawyer and cannot afford to hire one, I shall not be asked any questions and the Court will be requested to appoint a lawyer for me.

5. That if I agree to make a statement, I may stop at any time and request the presence of a lawyer and that no further questions will be asked of me.

6. That I have read this explanation of my rights and I understand the explanation. I hereby declare, with full knowledge and understanding of my rights, that I do not want a lawyer at this time. I am willing to answer questions and I wish to make a statement.

7. That no promises or inducements have been offered to me by anyone. I have not been threatened or intimidated by anyone and I have not been forced to make a statement. The decision to make a statement is entirely free and voluntary on my part."

that he left his apartment at 10:15 a.m. and when he got to the second floor he saw the deceased (Wilson) sitting on the floor, bleeding from the body. He got excited and started down the steps to the first floor. While on the steps he met Joseph Blount and several women (employees of Wilson from the restaurant). Joe asked him what was the noise and he replied that he and his brother-in-law, Haywood Simon, had been in a scuffle. Blount and the others went back in the restaurant and he went back up the stairs to the third floor where he started to enter his apartment but changed his mind and left the building by the fire escape and then walked to the Mondawmin Shopping Center where he purchased some records. He then signed the waiver of rights form. When Detective Caprionola began reducing the statement to writing, he said he did not want to say anything further and would wait for a lawyer. At this point all questioning stopped and he was returned to the cellblock.

The trial judge was satisfied that while Detective Caprionola became somewhat confused as to the timing of events, he was telling the truth. The trial judge found that appellant was fully advised of his rights prior to making the oral statement and had no doubt at all on the most critical issue, that when the appellant said he wanted to wait and talk to a lawyer, all questioning stopped and that appellant's verbal statement was made prior thereto.

We do not find that the fact that appellant changed his mind about committing his oral statement to writing indicated that appellant had not previously understood his rights. The weight of the evidence and the credibility of the witnesses are matters for the trier of fact. *Eley v. State,* 4 Md. App. 230, 234. The trial judge found Detective Caprionola to be an honest witness, and while on some minor matters his memory may have been faulty, that when presented with documentary evidence contradicting him, he went back and explained what had happened or explained the contradiction. *Wilson, Valentine*

*and Nutter v. State,* 8 Md. App. 653, 674. We find that the lower court properly overruled the appellant's motion to suppress appellant's second statement.

## THIRD AND FOURTH STATEMENTS

Appellant contends that his third and fourth statements were inadmissible because (1) they were involuntary as resulting from an inducement, (2) they violated due process of law, and (3) the rules of *Miranda v. Arizona, supra,* were not observed.

On June 7 at 10:20 p.m. appellant was transferred from Western to the Central District Police Station. Prior to his removal he had placed a telephone call to Miss Connie Brooks at 6:45 p.m. He was visited by his father, Henry Fellows, on June 8th at the Central District Police Station at 7:00 p.m.

Detective Caprionola testified that on June 8th at approximately 11:05 p.m. appellant was removed from the cellblock at Central upstairs to the homicide office. Present were Detectives Caprionola and Chlan. Some thirty hours had elapsed since appellant had indicated he would wait for a lawyer. Upon his arrival at the interrogation room he was advised of certain statements and evidence that had been obtained by the police as a result of further investigation, and that the evidence pointed towards him. Among the statements shown to appellant was one obtained from Haywood Simon which accused appellant of the commission of the crime. Appellant was then asked if he had obtained a lawyer, to which he replied he had not. Appellant was then asked if he wanted to talk to the officers or did he wish to wait until he obtained a lawyer. His *Miranda* rights were then read to him from the explanation of rights form and he was given the form and he read it but refused to sign it. Asked if that meant that he did not want to give a statement, appellant responded that he would neither sign nor write anything down, but would tell the officers what happened. Detective Caprionola testified that no threats,

promises or inducements were made to appellant, and that at 11:30 p.m. appellant gave a verbal statement. The substance of the statement was that Haywood Simon thought up the plan to rob Gene (Wilson) and talked appellant into helping him. On the day of the crime they left appellant's apartment and started downstairs when they saw Gene coming up the stairs. Haywood grabbed Gene and they started to wrestle around and both fell to the floor. Appellant leaned over and held Gene's shoulders and Haywood hit him with the knife. When appellant saw the blood coming, he got scared and ran down the stairs and saw Joe (Blount) coming up the stairs. He told Joe that he and Haywood had been wrestling around. Then Joe went back in the restaurant and he went back upstairs. When he got up to Haywood's apartment, Haywood had the bag with the money in his hand, in a red bag. Haywood told him to take it with him, but he said he would not and left. The statement was completed at approximately midnight and was subsequently typewritten by Caprionola.

Told that the statement did not coincide with other information the police had, the appellant was asked whether the other fellow was lying or was he lying. Appellant then said to Caprionola, "This time I'll tell you the truth," or something to that effect. Again advised of his rights from the Explanation of Rights Form, appellant responded that he knew his rights and at 12:30 a.m., June 9th, gave an oral statement, the substance of which was that he had gone down to pay his rent when he saw Gene coming up the steps. They stood in the hall on the second floor and talked. Gene asked him for his rent and he told him he didn't have it. Gene said if he couldn't pay it, he wanted the apartment back. They then got to arguing and appellant stuck him with a knife. Appellant just kept sticking him and Gene fell to the floor. Appellant picked up the money bag and ran down the steps, but heard Joe coming so he stopped. Joe asked him what the noise was, and he told Joe that he and Haywood were wrestling around and Joe left. He then went back

upstairs to Haywood's apartment and showed him the money. It was in the bag and the bag was full of blood. Haywood put the money bag in another bag and gave it to him. Appellant told him about Gene and then he left and took the money up to the Douglass School and hid it in some bushes.

Then, at approximately 1:15 a.m., appellant voluntarily directed the officers to the Douglass High School where he pointed out the location of the money. Recovered at that time was a brown paper bag containing a white paper bag with red stains, a white cloth bag from the First National Bank, and a red cloth bag; all containing stains resembling blood. In the bags were $1366.-13. The white paper bag had "Wilson's Restaurant" printed on it.

Appellant first argues that his third and fourth statements were inadmissible and should have been suppressed because there were inconsistencies in the testimony of Detective Caprionola brought out on cross-examination as to what had occurred prior to the giving of the statements. The trial judge believed, and found as a fact, that the series of events as Detective Caprionola stated them were the correct ones. What occurred has been previously set forth in this opinion. Appellant argues, however, that no matter which version is accepted, that both statements resulted from an inducement and are, therefore, involuntary under pre-*Miranda* standards relating to the admissibility of confessions. Appellant contends that when he was confronted with evidence the police had obtained, and in particular the statement given by Haywood Simon, and was told that the evidence pointed in his direction, that this was to induce him to make a statement, and was such an inducement as to render his statements involuntary. In support of his argument, he cites a number of cases: *Biscoe v. State,* 67 Md. 6; *Watts v. State,* 99 Md. 30; *State v. Dobbs,* 148 Md. 34; *Lubinski v. State,* 180 Md. 1; *Edwards v. State,* 194 Md. 387; *Kier v. State,* 213 Md. 556; and *Dennis v. Warden,* 6 Md. App. 295. However,

the facts in these cases are inapposite to the facts in the instant case. Appellant argues that the only purpose in reading the contents of the implicating statement of Haywood Simon was to show appellant that his previous exculpatory statement was not believable in the face of new evidence; that the only plausible reason for informing Fellows that his third statement did not coincide with the facts possessed by the police was to get him to tell the truth and, therefore, the June 8th and 9th statements were clearly the result of an inducement, and are inadmissible under Maryland law.

We do not agree. The pre-*Miranda* standards regarding the admissibility of an extra-judicial statement in Maryland is, "* * * [W]hether, considering the totality of the circumstances, the statement was voluntary. * * * To be voluntary, a statement cannot be 'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.' *Malloy v. Hogan,* 378 U. S. 1, 7. * * * More specifically, the Court of Appeals has held that the State must prove that the statement 'was not the product of force or of a promise, threat or inducement whereby the accused might be led to believe that there would be a partial or total abandonment of prosecution.' *Abbott v. State,* 231 Md. 462, 465; *Bean v. State,* 234 Md. 432, 439." *Keller v. State,* 2 Md. App. 623, 626-627.

Applying this standard to the facts in this case, it is apparent that the revealing to the appellant of the evidence that the State had obtained against him was not the type of inducement that would render his statements involuntary and inadmissible. The appellant was fully advised of his *Miranda* rights before he made any statement and knew that he had the right to remain silent and to counsel and that if he chose to exercise his rights, all questioning would cease. Other than advising appellant of the facts developed in the investigation, there was no evidence of force or violence or threats or other

inducements brought to bear upon appellant. Appellant argues that his response, "That's not the way it happened," when faced with incriminating statements from other witnesses, was an admission made prior to an explanation of his *Miranda* rights before he made his third statement and was not only inadmissible in itself, but rendered his subsequent statements, made after the *Miranda* warnings were given, inadmissible. This question was not raised below and the trial judge did not rule thereon. We, therefore, do not have to consider it. Maryland Rule 1085. However, it is apparent that the response was volunteered and not the subject of interrogation. See *Howell v. State*, 5 Md. App. 337, 338, 339, where the accused was merely presented with information that a co-defendant had made a confession involving him, and where the accused then made an incriminating response. This Court held that this was not the product of an interrogation, either direct or subtle, but more in the nature of volunteered information.

Finally, appellant argues the lower court erred in admitting his third and fourth statements into evidence because they resulted from interrogation improperly conducted after appellant had stated he wanted to wait for a lawyer before answering any further questions.

The lower court found that some 30 hours had elapsed from the time when appellant stated he wanted to wait for a lawyer before answering any further questions, and found, as a fact, that after being brought to the interrogation room and confronted with the results of further investigation, he was asked if he would talk without a lawyer or was he going to wait for a lawyer and his *Miranda* rights were read and explained to him. The trial judge further found that appellant's refusal to sign the rights form or give a written statement but would talk to the officers was not an invocation of his *Miranda* rights, since he knew, as indicated by his refusal to sign a written statement in connection with his second statement, that all he had to do was state that he did not

wish to continue and no further questions would be asked. The lower court found that the procedure followed by the police department in initiating the second interrogation or confrontation with appellant following his invoking the *Miranda* right to remain silent was permissible under *Miranda* as interpreted by this Court. We agree.

In *Conway v. State,* 7 Md. App. 400, this Court, speaking through Chief Judge Murphy, at p. 410 stated: "We cannot agree with the holding in *Fioritto* [2] that *Miranda* compels the conclusion that once the individual undergoing custodial interrogation invokes his privilege to remain silent he cannot thereafter, under any circumstances, be questioned, at least in the absence of counsel. We think the better rule is enunciated by those cases which hold in effect that the individual's right to remain silent, though once invoked, may subsequently, under appropriate circumstances, be waived within the rule governing the waiver of federal constitutional rights articulated in *Johnson v. Zerbst,* 304 U. S. 458, which was adopted in *Miranda, viz.,* an intentional relinquishment or abandonment of a known right or privilege the determination of which depends in each case upon the particular facts and circumstances surrounding that case. * * * We conclude that under the particular facts and circumstances of this case, the taking of appellant's written confession in no way violated *Miranda's* teachings and that the confession was properly received in evidence."

The lower court specifically found that the statements were voluntarily given and that the *Miranda* teachings were complied with in respect to all four statements and we cannot say that the lower court was erroneous.

*Judgment affirmed.*

---

2. *People v. Fioritto,* 441 P. 2d 625.