981 A.2d 1247

**Antonio Gonozalez BELOTE**

**v.**

**STATE of Maryland.**

**No. 103, Sept. Term, 2008.**

Court of Appeals of Maryland.

Oct. 13, 2009.

George E. Burns, Jr., Asst. Public Defender (Nancy S. Forster, Public Defender), on brief, for Petitioner.

Carrie J. Williams, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen.), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and ELDRIDGE JOHN C., (Retired, specially assigned), JJ.

BELL, C.J.

I. Introduction

The late Professor Charles Whitebread said it best: "The question of what constitutes an arrest is a difficult one." Charles H. Whitebread, *Criminal Procedure: An Analysis of*

*Constitutional Cases and Concepts* § 3.02 at 61 (The Foundation Press, Inc. 1980). Indeed, "[o]n one end of the spectrum, it seems apparent that detention accompanied by handcuffing, drawn guns or words to the effect that one is under arrest qualifies as an 'arrest' and thus requires probable cause. At the other end, a simple questioning on the street will often not rise to the level of an arrest." *Id.* This case gives substance to that cogent observation.

On the night of July 21, 2006,[1] Salisbury Police Officer James D. Russell approached Antonio Gonozalez Belote, the petitioner, smelled marijuana, conducted a *Terry* frisk, and searched the petitioner's pockets. Officer Russell's search revealed that the petitioner possessed marijuana. Instead of taking the petitioner into custody and immediately transporting him to the police station, Officer Russell let the petitioner go. It was not until October 12, 2006, more than two months later, that the petitioner was taken into custody. This Court issued a Writ of Certiorari to the Court of Special Appeals, *Belote v. State*, 406 Md. 442, 959 A.2d 792 (2008), to consider whether, as the trial court found and the Court of Special Appeals affirmed, Officer Russell's search of the petitioner on the night of July 21, 2006 was incident to a custodial arrest.[2]

We shall hold, based on our interpretation of his objective conduct and apparent subjective intent, that Officer Russell never made a custodial arrest of the petitioner. Therefore, we also shall hold that the trial court erred in finding otherwise and, accordingly, that the marijuana seized from the petitioner's pockets should have been suppressed. *See Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914);

---

1. The petitioner, in his brief, states that his encounter with Officer Russell occurred on July 21, 2007. A review of the Docket Entries reveals that the year of the encounter actually was 2006. Indeed, the Criminal Information charging the petitioner is dated October 27, 2006.

2. The question, as phrased by the petitioner in his Petition for Certiorari, was: did the lower courts err in concluding that an illegal frisk could be justified by subsequently deciding that it was an arrest?

*Longshore v. State,* 399 Md. 486, 924 A.2d 1129 (2007); *State v. Nieves,* 383 Md. 573, 861 A.2d 62 (2004).

## II. Facts/Procedural History

At approximately 9 p.m. on July 21, 2006, Officer James D. Russell, accompanied by Officer David Underwood and a representative from the State's Attorney's Office, was on bicycle patrol near Baker Street in Wicomico County, a part of a neighborhood that was known for open-air drug transactions and recently had been the site of a spate of shootings. Also present at that location, seated on a porch next to each other, and observed by Officers Russell and Underwood, were Kevin Lacato and Antonio Belote, the petitioner. Believing there was an outstanding warrant for Mr. Lacato, the officers approached him, but, as they did so, Officer Russell smelled marijuana emanating from the petitioner. Turning his focus to the petitioner, Officer Russell related what then occurred:

"[Officer Russell]: I asked Mr. Belote, if he had anything on him I needed to know about. He stated that he had nothing. As I got closer to him, the odor was extremely strong. I patted him [the petitioner] down for weapons. In doing so, I could see that he had, when he went from a seated position, you could see that he had a bulge in his pocket. He stood up. I could see that there was a bulge in the pocket and the odor of marijuana became even stronger when he stood. I removed the bag of marijuana from his pocket, containing six individually wrapped bags of marijuana.

"[Q]: Did you know this defendant from previous contact?

"[Officer Russell]: Yes, I have had several previous contacts with him. Based on those contacts, I know him to be a frequent person to be involved in CDS activity.

\*　　\*　　\*

"[Q]: At what point, did you decide you were going to arrest the defendant?

"[Officer Russell]: At the conclusion after recovering the marijuana, he had no weapons on him. For the purposes

that I was on bicycle patrol and not able to transport him back to the police department and the exile project that he had no weapons, he was cooperative with me. I seized the marijuana and completed an application for charges at a later date."

On cross-examination, Officer Russell testified, in relevant part, to the following:

"[Q]: Upon locating the marijuana in Mr. Belote's pocket, you would agree that's when you, in fact, placed him under arrest?

"[Officer Russell]: I never placed him [the petitioner] under arrest.

"[Q]: You never arrested him?

"[Officer Russell]: I completed an application of charges.

"[Q]: When, if you know?

"[Officer Russell]: I believe it was approximately a month or two months later. I couldn't type them up immediately because later than [sic] night I broke my hand, my right hand. I'm right-handed.

"[Q] So you would agree you never arrested him that evening?

"[Officer Russell]: No, I did not arrest him."

The petitioner was taken into custody, pursuant to an arrest warrant, on October 12, 2006, more than 2 months after his encounter with Officer Russell. The charge, Possession with the Intent to Distribute Marijuana, however, was based on the July detention and search. The petitioner filed, in the Circuit Court for Wicomico County, a Motion to Suppress the marijuana seized as a result of the July search, arguing both that Officer Russell lacked either a factual basis to justify the *Terry*[3] frisk of his person or probable cause to arrest him. The motions court denied the motion. Although it also held that Officer Russell lacked a valid basis for conducting a *Terry* frisk of the petitioner, the court concluded that Officer Rus-

---

3. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

sell's search of the petitioner's pockets on the evening of July 21, 2006, was incident to a lawful arrest. The motions court reasoned that "he [Officer Russell] had probable cause for a search and arrest at the time he smelled the raw marijuana and consequently the fact that the arrest was not made until later" had no bearing on the validity of the search.

The petitioner proceeded to trial on a Not Guilty Agreed Statement of Facts.[4] Not surprisingly, he was found guilty. He was sentenced to five years' imprisonment, with all but eighteen months suspended and placed on twenty-four months probation, upon his release from imprisonment.

The Court of Special Appeals, in an unreported opinion, affirmed the judgment of conviction rendered by the trial court. Before the intermediate appellate court, the petitioner raised two legal challenges to the motion court's denial of his Motion to Suppress. First, he argued that "the smell of marijuana and the presence of a bulge in his [the petitioner's] pocket" did not constitute probable cause and, thus, Officer Russell lacked probable cause to arrest the petitioner. He also argued that he was not "arrested" on the evening of July 21, 2006 and, consequently, the search that revealed the marijuana was not incident to a lawful custodial arrest. In support of the latter argument, the petitioner maintained that his "arrest" did not occur until approximately two months later, when he was taken into custody and brought to the police station under an arrest warrant.

The Court of Special Appeals agreed with the motion court's determination that Officer Russell had probable cause to arrest the petitioner after smelling marijuana. The intermediate appellate court concluded that Officer Russell's subsequent

---

4. *See Walker v. State*, 406 Md. 369, 384 n. 8, 958 A.2d 915, 923 n. 8 (2008) (noting that in *Atkinson v. State*, 331 Md. 199, 203 n. 3, 627 A.2d 1019, 1021 n. 3 (1993), this Court explained that an Agreed Statement of Facts essentially is a trial by stipulation in which no live witnesses are called); *see also Ingersoll v. State*, 65 Md.App. 753, 759, 501 A.2d 1373, 1376 (1986) (explaining that an agreed statement of facts eliminates the need to engage in fact finding).

detention of the petitioner consummated the petitioner's arrest:

> "While not formally taken to the police station at the time of his arrest, Belote was not free to leave. The standards established in *Bouldin [v. State,* 276 Md. 511, 350 A.2d 130 (1976) ] indicate that an arrest has occurred if the suspect is physically detained, subject to the control of the officer, or consents to be arrested. Officer Russell completed two of the three possible ways to effectuate an arrest when *he detained Belote by putting his hands on him and conducting a search of his body."* [5] (Emphasis added and italics omitted).

### III. Legal Analysis

 "[A] search conducted without a warrant supported by probable cause is per se unreasonable under the *Fourth Amendment,* subject to only a few exceptions." *Cherry v. State,* 86 Md.App. 234, 240, 586 A.2d 70, 73 (1991) citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854, 858 (1973); *Everhart v. State,* 274 Md. 459, 474–75, 337 A.2d 100, 109 (1975). One of those exceptions is that of a search incident to a lawful custodial arrest. *United States v. Robinson,* 414 U.S. 218, 224, 94 S.Ct. 467, 471, 38 L.Ed.2d 427, 434 (1973); *Chimel v. California,* 395

---

**5.** Both the trial court and the intermediate appellate court seem to rely on the physical contact between Officer Russell and the petitioner during the *Terry* frisk as the basis for finding that the petitioner was, or had been, "arrested." Officer Russell testified at the suppression hearing that, after he conducted his *Terry* frisk and failed to discover weapons on the petitioner, he saw a bulge in the petitioner's pocket and simply "removed the bag of marijuana" from it. Essentially, then, it was Officer Russell's contact with the petitioner during a *Terry* stop and frisk that the trial court determined was invalid that formed the basis for the arrest of the petitioner. The trial court's treatment of Officer Russell's contact with the petitioner raises the question on which we granted certiorari: can a police officer's contact during an invalidated *Terry* stop alternatively be used as the contact for justifying an "arrest?" We hold that it cannot. Indeed, this would open the door to the possibility that every *Terry* stop, even when the frisk conducted pursuant to it has been invalidated by a motions court, somehow could be the basis for finding that an "arrest" occurred.

U.S. 752, 759, 89 S.Ct. 2034, 2038, 23 L.Ed.2d 685, 692 (1969); *McChan v. State*, 238 Md. 149, 158, 207 A.2d 632, 638 (1965); *Gross v. State*, 235 Md. 429, 440, 201 A.2d 808, 814 (1964). There are two primary rationales that underlie the ability of the police to search an arrestee incident to a lawful custodial arrest: (1) to seize weapons from the arrestee that might be used to effect an escape or to harm law enforcement officers; and (2) to recover evidence that might be destroyed by the arrestee. *Robinson*, 414 U.S. at 234, 94 S.Ct. at 476, 38 L.Ed.2d at 439–40 (citing *Agnello v. United States*, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925)); *Chimel*, 395 U.S. at 764, 89 S.Ct. at 2040, 23 L.Ed.2d at 694 (1969) (quoting *Preston v. United States*, 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777, 780 (1964)); *Carter v. State*, 367 Md. 447, 458–62, 788 A.2d 646, 652–54 (2002); *St. Clair v. State*, 1 Md.App. 605, 612, 232 A.2d 565, 569 (1967). While these two rationales form the foundation for searching an arrestee incident to a custodial arrest, the Supreme Court has made it clear that the fact of a custodial arrest alone is sufficient to permit the police to search the arrestee. *Robinson*, 414 U.S. at 235, 94 S.Ct. at 477, 38 L.Ed.2d at 441; *Gustafson v. Florida*, 414 U.S. 260, 266, 94 S.Ct. 488, 492, 38 L.Ed.2d 456, 461 (1973).

Where there is no custodial arrest, however, these underlying rationales for a search incident to an arrest do not exist. An individual who does not believe that he has been arrested has no need to effect an escape or to harm the police officer that has detained him. Moreover, an individual who does not believe that he has been arrested has little or no need to destroy evidence and, thus, almost certainly will not destroy evidence that might be in his possession. Therefore, an officer's objective "manifestation of purpose and authority" at the "moment of arrest," by words or conduct, which signal to an individual that he or she is under arrest, will be, and always has been, significant in determining whether a custodial arrest has occurred in Maryland. Wayne A. Logan, *An Exception Swallows a Rule: Police Authority to Search Incident to Arrest*, 19 Yale L. & Pol'y Rev. 381, 431–32 (2001); *see Bouldin v. State*, 276 Md. 511, 518, 350 A.2d 130, 134 (1976);

*see also State v. Crutcher,* 989 S.W.2d 295, 302 (Tenn.1999) (holding that in order for there to be a custodial arrest, law enforcement must take some action that would indicate to a reasonable person that he or she is under arrest); Rollin M. Perkins, *The Law of Arrest,* 25 Iowa L.Rev. 201, 248 (1940). In other words, and contrary to the State's position here, the fact that a police officer conducts a *Terry* stop and has probable cause, without more, is not sufficient to give rise to a custodial arrest.

In *Balt. & Ohio R.R. Co. v. Cain,* 81 Md. 87, 101–02, 31 A. 801, 804 (1895) and *Balt. & Ohio R.R. Co. v. Strube,* 111 Md. 119, 127, 73 A. 697, 700 (1909), this Court developed a "working definition of arrest—the detention of a known or suspected offender for the purpose of prosecuting him for a crime." *Cornish v. State,* 215 Md. 64, 67–68, 137 A.2d 170, 172 (1957). In *Bouldin,* 276 Md. at 515–16, 350 A.2d at 133, we articulated the prerequisites for a custodial arrest in Maryland:

"It is generally recognized that an arrest is the taking, seizing, or detaining of the person of another (1) by touching or putting hands on him; (2) or by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest; or (3) by the consent of the person to be arrested. It is said that four elements must ordinarily coalesce to constitute a legal arrest: (1) an intent to arrest; (2) under a real or pretended authority; (3) accompanied by a seizure or detention of the person; and (4) which is understood by the person arrested.

"We have defined an arrest in general terms as the detention of a known or suspected offender for the purpose of prosecuting him for a crime. Our cases make clear, as *McChan* states, that in ordinary circumstances 'there is a detention only when there is a touching by the arrestor or when the arrestee is told that he is under arrest and submits [but][w]here there is no touching, the intention of the arrestor and the understanding of the arrestee are determinative, for in order for there to be an arrest in such case, there must always be an intent on the part of one to

arrest the other and an intent on the part of such other to submit.' Ordinarily, therefore, there can be no arrest where there is no restraint or where the person sought to be arrested is not conscious of any restraint. At least one court has concluded that an unconscious person cannot be subjected to a valid arrest. But, as indicated in Fisher, Laws of Arrest, chapter IV, at 52 (1967), it is only where there is no actual manual seizure of the arrested person that his intention or understanding assumes controlling importance." (Citations and italics omitted).

In *Bouldin*, we had to determine whether the personal effects of the appellant, Franklin Bouldin, had been searched incident to his custodial arrest. *Id.* at 512, 350 A.2d at 131. Bouldin, who was injured in a motorcycle accident, was found lying in the street in a semiconscious state. *Id.* Baltimore City Police Officer, Donald Aston, while at the scene, noticed, also lying in the street, a small flight bag, *id.* at 512–13, 350 A.2d at 131, which, Bouldin, before being placed in the ambulance, requested an ambulance attendant to retrieve and give to him. *Id.* at 513, 350 A.2d at 131. The ambulance attendant did so. When, during his investigation, Officer Aston discovered that the license plates of the motorcycle Bouldin was driving had been reported stolen, and that the motorcycle's serial number had been defaced, which is a misdemeanor in Maryland, he proceeded to the hospital "to check on ... [Bouldin's] condition and to place him under arrest." *Id.*

Bouldin was on a stretcher in an unconscious condition when Officer Aston arrived at the hospital. *Id.* Officer Aston located Bouldin's clothing beneath the stretcher and took them to an adjoining room to check for Bouldin's driver's license. *Id.* While searching through Bouldin's jacket, he discovered 20 glassine bags of heroin. Officer Aston then searched Bouldin's flight bag, which contained over 324 additional glassine bags of heroin. Officer Aston then placed Bouldin under a 24–hour guard at the hospital. *Id.* at 513, 350 A.2d at 131–32.

Bouldin moved to suppress the heroin uncovered by the search, arguing that the search of his belongings was not

incident to his arrest. *Id.* at 514, 350 A.2d at 132. Bouldin asserted that Officer Aston's actions and subjective intent, upon arriving at the hospital, were consistent with establishing Bouldin's identity, not making a custodial arrest. *Id.* at 517, 350 A.2d at 133. Moreover, Bouldin maintained that a custodial arrest only took place when Officer Aston placed him under an around the clock police guard, which occurred after Officer Aston searched his belongings. *Id.* The State, on the other hand, argued that the unconscious Bouldin was placed under arrest when Officer Aston came into visual contact with him at the hospital and that Officer Aston's subjective intent alone was dispositive of the issue of whether Bouldin was custodially arrested. *Id.* at 517, 350 A.2d at 134. The State reasoned that it would have been meaningless and unnecessary for Officer Aston, who had probable cause to do so, to tell the unconscious Bouldin that he was under arrest. *Id.* This Court did not agree. We held that the search of Bouldin's belongings was not incident to a custodial arrest. *Id.* at 519–20, 350 A.2d at 135.

In support of this holding, we explained that an arrest in Maryland ordinarily requires four elements to coalesce: "(1) an intent to arrest; (2) under a real or pretended authority; (3) accompanied by a seizure or detention of the person; and (4) which is understood by the person arrested." *Id.* at 516, 350 A.2d at 133 (citing 6A C.J.S. *Arrest* § 42 (1975)); *Longshore v. State*, 399 Md. 486, 502, 924 A.2d 1129, 1137–38 (2007). We reasoned that Officer Aston lacked the subjective intent to arrest Bouldin and failed to demonstrate, in his conduct or words, any objective acts that would reflect an intention to perform a custodial arrest of the unconscious Bouldin. *Bouldin*, 276 Md. at 518, 350 A.2d at 134. In concluding that Bouldin was not arrested at the time that Officer Aston searched his belongings, we emphasized that Officer Aston's conduct immediately prior to, and contemporaneously with, the search did not resemble the kind of conduct that indicated an intent to make a custodial arrest. *Id.* at 518–19, 350 A.2d at 134. In fact, we noted, Officer Aston "said nothing and did nothing before searching Bouldin's clothing to indicate to

anyone in control of Bouldin's medical care and movements that Bouldin was under arrest." *Id.*

In *Bouldin,* we approached the custodial arrest question by reviewing Officer Aston's objective conduct and subjective intent. *Id.* The *Bouldin* court's analysis established that, where a police officer's objective conduct unambiguously reflects an intent to make a custodial arrest, the subjective intent inquiry, which is one of the four elements reviewed to determine whether a custodial arrest occurred under *Bouldin,* takes on less significance. In other words, when an arresting officer's objective conduct, which provides significant insight into that officer's subjective intent, is unambiguous, courts need not allocate significant weight to an officer's subjective intent that is revealed partially in the form of his testimony at the suppression hearing; the officer's objective conduct, in effect, will have made his subjective intent clear. It is only when an arresting officer's objective conduct is ambiguous that his or her subjective intent increases in importance to a court's legal inquiry into whether a custodial arrest of the suspect occurred. The *Bouldin* court's focus on Officer Aston's subjective intent was a direct result of the fact that Officer Aston did not engage in or demonstrate any objective conduct that indicated that he was making a custodial arrest of the unconscious Bouldin:

> "That Bouldin was under arrest at the time of the search of the jacket is not reflected by the record before us. There was no evidence that Aston, immediately prior to or contemporaneously with the search of the jacket, had taken Bouldin into custody. He said nothing and did nothing before searching Bouldin's clothing to indicate to anyone in control of Bouldin's medical care and movements that Bouldin was under arrest. Indeed, there was no evidence that Bouldin was subject to Aston's physical dominion any earlier than when the guard was posted subsequent to the seizure of the heroin from the flight bag. While the testimony at trial is capable of differing interpretations as to the actual time of arrest, the only interpretation supportive of an arrest prior to the search of the jacket is based solely on Aston's claimed

subjective intention that he went to the hospital to arrest Bouldin. It is true that during the course of the trial Aston responded affirmatively to the question whether Bouldin was 'subsequently placed under arrest,' but this response does not establish whether the arrest was made prior to or after the search of the jacket and flight bag, nor does it give any indication how Aston effected the arrest. More significant and to the point was Aston's testimony that he did not arrest Bouldin upon arriving at the hospital because Bouldin was unconscious and he could not communicate with him."

*Id.* at 518–19, 350 A.2d 130. Certainly, *Bouldin* was unusual from a factual perspective in that the target of the alleged custodial arrest was unconscious. This factual anomaly, however, does not marginalize the *Bouldin* decision's analytical significance to the law of arrest in Maryland.

The definition of arrest that we articulated in *Bouldin* applies to all custodial arrests in Maryland. *See Barnhard v. State,* 325 Md. 602, 611, 602 A.2d 701, 705 (1992) (indicating that under the law of arrest articulated in *Bouldin,* the appellant was not under arrest when law enforcement simply advised the appellant that he would be taken into custody if he failed to identify himself); *Little v. State,* 300 Md. 485, 509–10, 479 A.2d 903, 915 (1984) (citing *Bouldin* for law of arrest in determining the constitutionality of police roadblocks to detect drunk drivers). An officer's objective conduct frequently is the sole indicia from which courts can determine whether, for purposes of search incident analysis, an individual has been arrested. *Dixon v. State,* 133 Md.App. 654, 673, 758 A.2d 1063, 1073 (2000) (holding that defendant was arrested when his car was blocked in, he was removed, and then handcuffed). *See, e.g., Grier v. State,* 351 Md. 241, 252, 718 A.2d 211, 217 (1998) (holding that the defendant was under arrest when he was put "on the ground").

Our decision in *Morton v. State,* 284 Md. 526, 397 A.2d 1385 (1979) is instructive. In *Morton,* this Court was asked to determine whether a police search of the defendant's personal belongings was incident to his arrest. *Id.* at 528, 397 A.2d at

1387. The facts were that Officer Rice received "information" from a pharmacist that Percy Morton, the appellant, was involved in an armed robbery of a cabdriver that occurred the previous night. *Id.* at 527–528, 397 A.2d at 1386–87. Acting on this uncorroborated "information," he stopped and frisked Morton, who, at the time, was wearing a black jacket and carrying a plastic bag. *Id.* at 528, 397 A.2d at 1387. That encounter revealed nothing, so Morton was allowed to go on his way. *Id.* Subsequently, Officer Rice obtained new "information" from another law enforcement officer, that Morton actually might be wanted. *Id.* Having kept Morton under observation, the police accosted him at a neighborhood recreation center, and confronted him with the possibility that he was wanted. At that time Morton was not wearing the jacket or carrying the plastic bag. *Id.* Officer Rice told Morton to accompany him and to bring the jacket and bag with him, in response to which Morton advised that his cousin had left the recreation center with those items. *Id.* Aware that the reports from the surveillance teams monitoring the recreation center indicated that no one had left since Morton's arrival, Officer Rice left Morton in a patrol car with another officer and returned to the recreation center to search for the jacket and bag. *Id.* at 528, 397 A.2d at 1387. The jacket and bag were found in a different room from that in which Morton had been found, "away from everybody" else. *Id.* at 528–29, 397 A.2d at 1387. In the jacket and bag Officer Rice found a handgun and marijuana. *Id.* at 529, 397 A.2d at 1388.

In reversing Morton's conviction, we reviewed the law of arrest in Maryland. In particular, we reaffirmed our adherence to *Bouldin,* reiterating that an arrest is the taking, seizing or detaining of the person of another, *inter alia,* by any act that indicates an intention to take him [the arrestee] into custody and that subjects him to the actual control and will of the person making the arrest. *Id.* at 530, 397 A.2d at 1388 (citing *Bouldin v. State,* 276 Md. 511, 515–16, 350 A.2d 130, 133 (1976)). We concluded that *Morton* was "arrested," albeit without probable cause, when he was "removed from the recreation center and placed ... under guard in the patrol

car." *Morton,* 284 Md. at 530, 397 A.2d at 1388. Thus, we stated, Officer Rice's conduct manifested an objective intent to "arrest" Morton, and, indeed, Officer Rice's placement of Morton in the patrol car under guard without his consent, constituted a seizure or detention of Morton. And, we were clear, Officer Rice's objective conduct made his intention to arrest Morton unequivocal. *Id.*

■ When reviewing an appeal from the denial of a motion to suppress evidence, an appellate court looks only to the evidence that was presented at the suppression hearing. *Jones v. State,* 407 Md. 33, 44, 962 A.2d 393, 399 (2008); *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519, 525 (2000); *Sparkman v. State,* 184 Md.App. 716, 727 n. 6, 968 A.2d 162, 168 (2009); *Smith v. State,* 182 Md.App. 444, 455, 957 A.2d 1139, 1145 (2008); *Sellman v. State,* 152 Md.App. 1, 7, 828 A.2d 803, 807 (2003). The reviewing court views the evidence in the light most favorable to the prevailing party and defers to the motions court with respect to its first level factual findings. *Longshore v. State,* 399 Md. 486, 498, 924 A.2d 1129, 1135 (2007) (stating that an appellate court defers to the hearing judge's determination regarding the facts of a particular case); *State v. Nieves,* 383 Md. 573, 581–82, 861 A.2d 62, 67 (2004) (same); *see also State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439, 444 (2003); *Sellman,* 152 Md.App. at 14, 828 A.2d at 811. The ultimate determination of whether there was a constitutional violation, however, is an independent determination that is made by the appellate court alone, applying the law to the facts found in each particular case. *Carter v. State,* 367 Md. 447, 457, 788 A.2d 646, 651 (2002); *Sellman,* 152 Md.App. at 14, 828 A.2d at 811.

■ Officer Russell's encounter with the petitioner did not objectively manifest an intent to perform a custodial arrest of the petitioner. Officer Russell testified, in relevant part, at the suppression hearing:

"[Officer Russell]: While we were identifying Kevin Lacato and waiting for the warrant to come back, I smelled an odor of marijuana coming from Mr. Belote. I asked Mr. Belote,

if he had anything on him I needed to know about. He stated that he had nothing. As I got closer to him, the odor was extremely strong. I patted him down for weapons. In doing so, I could see that he had, when he went from a seated position, you could see that he had a huge bulge in his pocket. He stood up. I could see that there was a bulge in the pocket and the odor of marijuana became even stronger when he stood. I removed the bag of marijuana from his pocket, containing six individually wrapped bags of marijuana."

After retrieving the marijuana from the petitioner's pocket, Officer Russell allowed the petitioner to continue on his way. The record does not indicate whether Officer Russell put the petitioner in handcuffs or told him that he was "under arrest." [6] Nor does the record reveal that the petitioner's identification or address was obtained or verified for later contact. Officer Russell's ambiguous conduct on the night of July 21, 2006 did not resemble the objective conduct that we contemplated as being sufficient to consummate a custodial arrest in *Bouldin.*[7]

---

**6.** We reiterate that it is the State's responsibility to "insure that there will be sufficient evidence, if any exists, placed in the record to justify the execution of a warrantless search incident to a lawful arrest." *Howell v. State,* 271 Md. 378, 386, 318 A.2d 189, 193 (1974).

**7.** The State's position in this case is that law enforcement, in order to effect a custodial arrest, only needs probable cause and detention of the suspect; any subsequent conduct by the officer is irrelevant to the arrest inquiry. In fact, the State asserts that the "sole question before this Court [is] whether the initial detention [is] an arrest sufficient to justify the subsequent search as incident to that arrest." If this Court were to adopt the State's view, every *Terry* stop would be a custodial arrest, assuming that the probable cause hurdle could be satisfied. This simply cannot be the case under *Bouldin,* because an "arresting officer" would not need to have any intent whatsoever to execute a custodial arrest. Thus, intent, both subjective and objective, to effect a custodial arrest, becomes irrelevant under the State's view and completely negates the first of the four elements, as articulated in *Bouldin,* necessary to give rise to a custodial arrest. We recognize that our holding today is inconsistent with certain portions of our decision in *State v. Evans,* 352 Md. 496, 723 A.2d 423 (1999), and, to the extent that it is inconsistent, *Evans* is hereby overruled.

Contrary to the State's assertions, the instant case is materially different from that of *State v. Evans*, 352 Md. 496, 723 A.2d 423 (1999), *cert. denied*, 528 U.S. 833, 120 S.Ct. 310, 145 L.Ed.2d 77 (1999). In *Evans*, we considered two cases, *State v. Evans* and *State v. Sykes–Bey*, which were consolidated for our review. In both cases, we held that the defendants were "arrested" following undercover drug purchases by two separate task forces of the Baltimore City Police Department. *Id.* 352 Md. at 499, 723 A.2d at 424. The issue in both cases was whether the defendants were arrested under Maryland law. *Id.* at 500, 723 A.2d at 424. An undercover police officer purchased a "dime[ ]" of cocaine from Dwight Evans on Monument Street in Baltimore City. *Id.* at 501, 723 A.2d at 425. After the purchase, the undercover officer transmitted a description of Evans to a nearby "identification team" composed of task force members. *Id.* Members of the task force stopped and detained Evans until the undercover officer was able to confirm that Evans was the one that sold him the cocaine. After the undercover officer confirmed that the right individual had been detained, the task force members then searched Evans, photographed him, verified his address and then released him. *Id.* at 502, 723 A.2d at 425–26. This was done in order to avoid alerting other potential drug dealers to the task force's operations. Evans was not transported to the stationhouse, not formally charged with a crime and not taken to the District Court Commissioner for processing. *Id.* at 502, 723 A.2d at 426. Approximately one month after the task force had completed operations in the neighborhood, Evans was arrested as a part of a "mass sweep" for individuals that the task force previously had caught as a result of its undercover operation. *Id.* at 500, 723 A.2d at 425.

In the other case, Charles Sykes–Bey approached an undercover officer who was engaged in buying cocaine from one of Sykes–Bey's competitors. *Id.* at 504, 723 A.2d at 426–27. The undercover officer asked Sykes–Bey whether he had "two dimes" worth of cocaine, *id.* at 504, 723 A.2d at 427, to which Sykes–Bey replied that he sold only "weight," meaning larger

quantities of cocaine. *Id.* The undercover officer then purchased two dimes of crack cocaine from Sykes–Bey's competitor. *Id.* After purchasing the crack cocaine, the undercover officer transmitted a description of both Sykes–Bey and the man from whom he had purchased cocaine. *Id.* Before detaining Sykes–Bey, an officer on the task force witnessed Sykes–Bey receive money from an unidentified woman. *Id.* at 505, 723 A.2d at 427. After receiving the money, Sykes–Bey walked to the side of a store, placed his hand behind a billboard that was attached to the building and retrieved an unidentified amount of cocaine. *Id.* at 505 n. 6, 723 A.2d at 427 n. 6. Soon after witnessing this transaction, the task force detained Sykes–Bey and discovered eleven vials of cocaine from behind the billboard that Sykes–Bey visited after receiving the money from the unidentified woman. *Id.* at 505, 723 A.2d at 427. Members of the task-force stopped and detained Sykes–Bey, as in *Evans,* ascertaining his identity, address and birth date. *Id.* at 505, 723 A.2d at 427. They also searched Sykes–Bey, seizing $134 in currency from him, and photographed him. Sykes–Bey also was released until the "mass sweep" that took place over one month later. *Id.* at 503, 505, 723 A.2d at 426–27.

Both Evans and Sykes–Bey filed Motions to Suppress, arguing that the evidence obtained by the task forces had been unlawfully seized because they had not been arrested. *Id.* at 502–503, 505, 723 A.2d at 426, 427. Evans conceded that there had been probable cause for his arrest on the day of the incident, but he argued that the police did not arrest him under Maryland law. *Id.* at 508, 723 A.2d at 429. Sykes–Bey's argument was identical to Evans's. He too reasoned that there was no arrest where the police did not transport him to the stationhouse or immediately commence the charging process. *Id.* at 509–10, 723 A.2d at 429. According to both Evans and Sykes–Bey, they were not, "arrested" until the mass sweeps that occurred after the task forces had ceased their operations in the neighborhood which, in both

cases, was well over one month after the undercover buys.[8]

In *Evans,* after citing the *Bouldin* test for arrest, we disavowed the statement that followed:

> "We have defined an arrest in general terms as the detention of known or suspected offender for the purpose of prosecuting him for a crime." (Italics and citations omitted).

*State v. Evans,* 352 Md. 496, 513, 723 A.2d 423, 431 (1999) (quoting *Bouldin v. State,* 276 Md. 511, 515–16, 350 A.2d 130, 133 (1976)). As to the language we disavowed, we said that "[n]otwithstanding this gratuitous language in *Bouldin* and its incantation in a number of Maryland cases since, this Court has never *held* that a valid arrest in Maryland requires of the arresting officer an intent to prosecute the arrestee for the crime believed to have been committed." *Id.* at 513–14, 723 A.2d at 431 (Italics omitted and emphasis in original). We also noted that a law enforcement official ordinarily has no authority to prosecute arrestees. *Id.* at 514 n. 14, 723 A.2d at 431 n. 14. In addressing whether an "arrest" had occurred in Evans, we focused our inquiry on the actions taken by the task force members contemporaneous with, or immediately following, the search of the defendants. Indeed, we took care to outline the procedures that these task forces employed after stopping and detaining Evans and Sykes–Bey:

> "In accordance with the undercover investigation procedures in these cases, the police members of the 'identifica-

---

**8.** Our holding today does not affect the ability of the police to conduct task force operations, such as those conducted in *Evans.* Thus, task force operations that conduct "mass sweeps" after a custodial arrest are still valid in Maryland. We simply made clear what was and is implicit in *Evans,* that custodial arrests, as regarded between the task force and the arrestee, must be accompanied by objective conduct that indicates the intention of the police to arrest an individual and call him or her to task for his or her criminal activity at some future date. Although we hold that there was no custodial arrest in the petitioner's case, we need not, and will not decide whether the more than two month delay between the alleged "arrest" of the petitioner and the commencement of formal booking process exceeds constitutional bounds. Resolution of that question must await another case.

tion teams,' acting upon probable cause, both physically restrained Evans and Sykes–Bey and subjected each of them to their police custody and control. In the case of Evans, the police stopped him as a suspect and required him to produce identification. When he was unable to produce satisfactory identification, the police held Evans for a significant length of time until his father could adequately identify him. During that time period, the police searched and photographed Evans, while also filling out an identification form. Respondent Sykes–Bey was treated in similar fashion by the Baltimore City Police."

*Id.* at 515, 723 A.2d at 432. We noted, in that regard, that, as a result of the procedures employed by these task forces, "[i]t is ... beyond question that the initial detentions of Respondents [Evans and Sykes–Bey] rose to the level of either a physical restraint or a subjugation to police custody and control." *Id.* at 515, 723 A.2d at 432. Essentially, the identification procedures implemented by the task forces at the scenes of the undercover buys made the arresting officers' subjective intent to perform a custodial arrest quite clear because any ambiguity that might have been created as a result of allowing Evans and Sykes–Bey to go on their way was eliminated, or significantly reduced, when the task forces procured Evans's and Sykes–Bey's contact information. In the case *sub judice*, Officer Russell's objective conduct became unclear when he let Mr. Belote go without, at least there is no indication of it in the record, obtaining detailed contact information from him on the porch that evening.[9] The ambiguity created by Officer Russell's objective conduct has made his subjective intent even more significant to our custodial arrest inquiry.

 Officer Russell's subjective intent to execute a custodial arrest of Mr. Belote on July 21, 2006 was, at best,

---

**9.** While Officer Russell testified that he was familiar with Mr. Belote, this familiarity with the petitioner does not serve as a substitute for the procedures that the task forces in *Evans* utilized when arresting Evans and Sykes–Bey. It is these objective procedures that allow us to engage in our arrest inquiry.

ambiguous. When determining whether a police officer subjectively intended to custodially arrest a suspect, this Court looks not only to the police officer's objective conduct but also, while not dispositive, to his testimony regarding whether he placed the suspect under arrest prior to or contemporaneously with his search. *See, e.g., Bouldin,* 276 Md. at 518–19, 350 A.2d at 134–35. In the instant case, Officer Russell detained Mr. Belote on the porch and subsequently searched his pockets. From this conduct, the State asserts that a custodial arrest of Mr. Belote had occurred. The State's conclusion, however, does not take into account the fact that Officer Russell released Mr. Belote immediately afterward, injecting ambiguity into what otherwise might be sufficiently objective conduct evidencing a custodial arrest. Moreover, Officer Russell did not even complete an application of charges until nearly two months after his encounter with Mr. Belote. As we indicated in *Bouldin,* where an officer's objective conduct is ambiguous regarding whether a custodial arrest has occurred, we look to an officer's subjective intent. *See Id.* at 516, 350 A.2d at 133. At the suppression hearing, Officer Russell testified, on cross-examination, that he did not arrest Mr. Belote on the night of July 21, 2006:

"[Defense Counsel]: Upon locating the marijuana in Mr. Belote's pocket, you would agree that's when you, in fact, placed him under arrest?

"[Officer Russell]: I never placed him under arrest.

"[Defense Counsel]: You never arrested him?

"[Officer Russell]: I completed an application of charges.

"[Defense Counsel]: When, if you know?

"[Officer Russell]: I believe it was approximately a month or two months later. I couldn't type them up immediately because later than [sic] night I broke my hand, my right hand. I'm right-handed.

"[Defense Counsel]: So you would agree you never arrested him that evening?

"[Officer Russell]: No, I did not arrest him."

Officer Russell's testimony that he did not arrest Mr. Belote on the night of July 21, 2006, coupled with his ambiguous

objective conduct, persuade us that he never consummated a custodial arrest of Mr. Belote.[10]

The State's attempt to argue that the instant case is similar to *Evans* lacks merit. The key distinction between *Evans* and the instant case is that, in *Evans*, the task forces manifested their intent to arrest Evans and Sykes–Bey through their actions. For example, members of the task forces photographed, identified and verified the addresses of both Evans and Sykes–Bey while they were detained and before they were released. *Evans*, 352 Md. at 500, 505, 723 A.2d at 425, 427. Indeed, the identification procedures implemented by the task forces in *Evans* mitigated, if not eliminated, the potential for ambiguity that might arise as a result of Evans and Sykes–Bey being released shortly after being caught by the task forces. In the instant case, Officer Russell did not imitate or follow the procedures outlined in *Evans* and, as a result, left Mr. Belote in limbo about the consequences of his possessing the contraband that the search of his person uncovered.

In *Evans*, we said that "whether the officer intends that a detention lead to a *prosecution* has no bearing on whether an arrest has occurred." *Id.* at 514, 723 A.2d at 431 (emphasis added). From this statement, the State deduces that subjective intent is irrelevant when effecting an arrest. We reject

---

**10.** We are cognizant that Officer Russell, on direct examination, gave the following testimony in response to the State's question on whether he arrested the defendant, Mr. Belote:

"[Prosecutor]: At what point, did you decide you were going to arrest the defendant?

"[Officer Russell]: At the conclusion after recovering the marijuana, he had no weapons on him. For the purposes that I was on bicycle patrol and not able to transport him back to the police department and the exile project that he had no weapons, he was cooperative with me. I seized the marijuana and completed an application for charges at a later date."

In our opinion, Officer Russell's testimony on crossexamination, in which he twice denied that he arrested Mr. Belote, carries more weight than the, arguably, nonresponsive answer that he gave in the above colloquy.

the State's contention that an "officer's subjective intent when performing ... [an arrest] is irrelevant." Despite the State's failure even to mention in its brief, our seminal decision of *Bouldin v. State*, 276 Md. 511, 350 A.2d 130 (1976), we believe that it is important to clarify the "intent" prerequisite that we established in *Bouldin*.

An officer's subjective intent to "arrest" an individual at the time of his encounter is important where an officer's objective conduct does not indicate clearly that a custodial arrest has been made. In *Bouldin*, we emphasized that when there is no touching by the arresting officer, "there must always be an intent on the part of one to arrest the other and an intent on the part of such other to submit." *Id.* at 516, 350 A.2d at 133 (quoting *McChan*, 238 Md. at 157, 207 A.2d at 638 (1965)). The "intent," to which the *Bouldin* court referred, had nothing to do with an officer's intention to prosecute an individual. In fact, as previously noted, law enforcement officers in Maryland ordinarily do not have any authority to prosecute those that they have arrested, since by constitutional provision, the power of prosecution rests with the Attorney General, *see Md. Const. Art. V, § 3*, the State's Attorney, *see Md. Const. Art. V, § 9* and the State Prosecutor, *see* Maryland Code (2004 Repl.Vol., 2008 Supp.) § § 9–1202 to 9–1207 of the State Government Article.[11] *Evans* simply stated what has always been clear under Maryland law: police officers generally lack the power of prosecution. It would be quite perverse for Maryland courts to require that the police have an intention to perform an act that Maryland law does not vest

---

11. The Governor also has the power to direct the Attorney General to prosecute certain civil and criminal actions under *Md. Const. Art. V, § 3:*

"(a) The Attorney General shall:

"(2) Investigate, commence, and prosecute or defend any civil or criminal suit or action or category of such suits or actions in any of the Federal Courts or in any Court of this State, or before administrative agencies and quasi legislative bodies, on the part of the State or in which the State may be interested, which the General Assembly by law or joint resolution, or the Governor, shall have directed or shall direct to be investigated, commenced and prosecuted or defended."

in them. An officer's inability to bring formal charges against a suspect, however, does not mean that that officer cannot recommend to the State Prosecutor that charges be brought against the suspect in the officer's custody. In fact, that is an inherent power that flows from a police officer's authority to make arrests. *See, e.g.,* Maryland Code (2001, 2006 Supp.) § 2–102 of the Criminal Procedure Article. Hence, our opinion in Bouldin, the same opinion to which, in dicta, *Evans* referred, simply indicated that Maryland courts, before finding that an "arrest" has occurred, will look to an officer's intent, as evidenced by his objective conduct in the form of his actions and words, and even his subjective state of mind, to determine whether that officer intended to take the arrestee into custody and subject the arrestee to his or her actual control and will. *Bouldin,* 276 Md. at 515–16, 350 A.2d at 133. As neither Officer Russell's objective conduct nor his subjective intent manifested an intention to effect a custodial arrest of the petitioner, we shall reverse the motions court's denial of the petitioner's Motion to Suppress.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY. COSTS TO BE PAID BY WICOMICO COUNTY.**

Dissenting Opinion by MURPHY, J., which HARRELL and ADKINS, JJ., join.

I dissent from the holding that, because "Officer Russell never made a custodial arrest of the petitioner[,] ... the marijuana seized from the petitioner's pockets should have been suppressed." In my opinion, because that marijuana was seized from his person during a search incident to a lawful "constitutional" arrest, Petitioner was not entitled to suppression on the ground that he was subjected to a "custodial" arrest more than two months after the date on which the seizure occurred.[1]

---

1. If a substantially contemporaneous "custodial" arrest is a condition precedent to the introduction of contraband seized during a lawful

I agree with the motions court that Officer Russell "had probable cause for a search and arrest at the time he smelled the raw marijuana [emanating from Petitioner] and consequently that the [custodial] arrest was not made until later" did not invalidate the legality of the seizure. Because the motions court was not clearly erroneous in believing Officer Russell's testimony that the odor of marijuana emanating from Petitioner's person was "extremely strong," this testimony established that Officer Russell had probable cause to believe that Petitioner was in possession of marijuana. Under these circumstances, there are two reasons why the seizure at issue did not violate Petitioner's Fourth Amendment protection against unreasonable government intrusion.

## I.

First, it is of no consequence that Petitioner was not subjected to a "custodial" arrest until October 12, 2006. A "custodial" arrest occurs when "a known or suspected offender" is detained and taken into custody "for the purpose of prosecuting him [or her] for a crime." *Cornish v. State*, 215 Md. 64, 67–68, 137 A.2d 170, 172 (1957). The defendant who is subjected to a "custodial" arrest is taken into custody regardless of whether any incriminating evidence is turned up during a search incident to that arrest. In *State v. Evans*, 352 Md. 496, 723 A.2d 423 (1999), however, while analyzing a forcible stop and search to which the Fourth Amendment was applicable—a "constitutional" arrest, which is distinguishable from a "custodial" arrest—this Court held that a "custodial" arrest is

warrantless search, the officer who seizes a suspected controlled dangerous substance under these circumstances will never be able to exercise the option of (1) releasing the defendant pending a scientific test of the suspected contraband, and (2) upon confirmation that what was seized is indeed contraband, presenting an APPLICATION FOR STATEMENT OF CHARGES to a District Court Commissioner, who is required by Md. Rule 4-212 to decide whether a warrant should be issued for the defendant's arrest or whether "a summons shall be issued to the defendant[.]" Busy law enforcement officers—and the citizens who need them "on the street"—should not be denied that option.

not the only *lawful* or *valid* arrest recognized by Maryland law. *Id.* at 515, 723 A.2d at 432.

In *Evans*, while rejecting the argument that contraband lawfully seized pursuant to a search of the defendant's person must be suppressed if—at the time of the search—the intent of the officer conducting the search was to (1) release the defendant when the search was completed, (2) file charges against the defendant *only* if the search turned up incriminating evidence, and (3) file any charges at a much later date, this Court stated:

> There is no question in these cases that Evans and Sykes–Bey were seized by the police prior to the search which uncovered the evidence that Respondents sought to suppress. Respondents argue, however, and the Court of Special Appeals agreed, that there was required on the part of the officers an intent to prosecute, which intent did not exist because the police did not intend to formally charge either Evans or Sykes–Bey until a date much later than the initial detention and search incident thereto. Neither Evans nor Sykes–Bey argues that the police wholly lacked the intent to prosecute; their argument is solely that the intent to prosecute had to be manifested contemporaneously with the initial seizure.

> We hold that for a lawful arrest in Maryland for the commission of a felony, a police officer must have probable cause to believe the suspect has committed a felony and must either physically restrain the suspect or otherwise subject the suspect to his or her custody and control. **We reject Respondents' argument that failure of the police to initiate the formal criminal charging process at or near the time of the initial detention precludes a valid arrest under Maryland law. This State's law of arrest extends no talismanic significance to the act or intention of initiating the formal booking process.** On the contrary, formally charging a suspect is not a *sine qua non* to a lawful arrest in Maryland.

*　　*　　*

This Court and the Court of Special Appeals have often recognized the inherent danger of drug enforcement, such that an investigatory stop based upon a reasonable suspicion that a suspect is engaged in drug dealing "can furnish the dangerousness justifying a frisk" for weapons. *Simpler v. State*, 318 Md. 311, 318, 568 A.2d 22, 25 (1990). *See State v. Blackman*, 94 Md.App. 284, 299, 617 A.2d 619, 626 (1992); *Aguilar v. State*, 88 Md.App. 276, 283, 594 A.2d 1167, 1170–71 (1991). Myriad other courts have likewise held that the justification to conduct a weapons frisk of a person stopped for suspected involvement in drug trafficking can flow directly from the nature of the criminal activity itself. *See, e.g., United States v. Rivers*, 121 F.3d 1043, 1045 (7th Cir.1997); *United States v. Robinson*, 119 F.3d 663, 667 (8th Cir.1997); *United States v. McMurray*, 34 F.3d 1405, 1410 (8th Cir.1994); *United States v. Cruz*, 909 F.2d 422, 424 (11th Cir.1989); *United States v. Anderson*, 859 F.2d 1171, 1177 (3rd Cir.1988). Where the officers who arrested each Respondent had probable cause to believe the two were trafficking in drugs, we can neither dismiss nor diminish the safety concerns of those officers. While admittedly not transporting the arrestees to the station house, the officers were nonetheless engaged in more than a routine investigatory stop. The arrest, identification, evidence procurement and recordation procedures for the undercover narcotics operations took some time to effect and consequently placed the officers at significant risk should they not have immediately and fully searched each arrested suspect.

\* \* \*

In addition to officer safety, the threat to valuable evidence was a substantial concern in the instant cases. Even though Evans and Sykes–Bey may have perceived themselves as not having been arrested because they were not carted off to the police station, it is indisputable that had they simply been released after their identification was secured, the police would have lost valuable evidence of the crimes for which Respondents were arrested, i.e. the marked money and additional drugs. *See* 3 WAYNE R.

LAFAVE, SEARCH AND SEIZURE § 5.2(h), at 99 (3d ed. 1996) (A search based on the need to procure evidence "is no less lawful when incident to an arrest not of a 'custodial' nature."). The State's prosecution of Evans and Sykes–Bey for the crimes at issue, without recovery of the marked money and additional drugs, would certainly have been weakened significantly. **Therefore, because of the officers' legitimate concerns both for their own safety and for the preservation of evidence, we hold that the searches incident to Respondents' valid arrests satisfied the requirements of the Fourth Amendment and were constitutional.**

*Id.* at 514–15, 522–24, 723 A.2d at 432, 435–436. (Emphasis supplied).

Rather than overrule *Evans* "to the extent that it is inconsistent" with the majority opinion in the case at bar, I would reaffirm what this Court stated in that case, and therefore affirm the ruling of the motions court on the ground that the marijuana seized from Petitioner's person was seized during a search incident to a valid "constitutional" arrest based upon probable cause.

## II.

Second, the marijuana was seized during a search that complied with the requirements of *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), in which the United States Supreme Court recognized an exception to the warrant requirement for searches for "highly evanescent evidence" when the facts establish (1) "the existence of probable cause" and (2) "the ready destructibility of the evidence." *Id.* at 296, 93 S.Ct. at 2004. In *Commonwealth v. Washington,* 449 Mass. 476, 869 N.E.2d 605 (2007), while affirming the denial of a motion to suppress incriminating evidence seized from defendants who were not arrested at the time of the search, the Supreme Judicial Court of Massachusetts stated:

In general, a police search or seizure must be supported by a valid warrant.... However, it is well settled that, in

certain "exigent circumstances" that make obtaining a warrant impracticable, . . . a search or seizure may be justified by probable cause. . . . One such exigent circumstance is the threat of imminent loss of evidence. *See generally Cupp v. Murphy*, 412 U.S. 291, 296, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973); *Commonwealth v. Skea*, 18 Mass.App.Ct. 685, 697, 470 N.E.2d 385 (1984). Here, because there was probable cause to arrest the defendants for participating in an illegal drug transaction, and crucial evidence of that transaction would have been lost if the police had not searched immediately, the search of the defendants was justified.

The motion judge determined that, at the time the defendants were stopped, the troopers had probable cause to arrest them for trafficking in cocaine. We agree.

\* \* \*

Because there was probable cause to arrest, the motion judge upheld the search as one incident to an arrest. The problem with this analysis is that the defendants were not arrested at the time of the search or at a time "substantially contemporaneous" thereto. *New York v. Belton*, 453 U.S. 454, 465, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). . . . The judge noted correctly that a suspect need not be formally under arrest at the precise moment of a search incident to an arrest; the search may precede the formal arrest so long as probable cause exists independent of the results of the search. . . . However, the search and the arrest still must be roughly contemporaneous.

\* \* \*

We may affirm the denial of a motion to suppress on any ground supported by the record, . . . and in this case, the search was amply justified by probable cause and exigent circumstances. In *Cupp v. Murphy*, 412 U.S. 291, 295–296, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), the United States Supreme Court recognized that imminent loss of evidence presents exigent circumstances justifying a warrantless search or seizure. In that case, the defendant had gone to the police in connection with the strangulation murder of his

wife. *Id.* at 292, 93 S.Ct. 2000. It was undisputed that the police had probable cause to arrest him. *Id.* at 293, 93 S.Ct. 2000. However, without a formal arrest or a warrant, and over the defendant's protest, the police took scrapings from the defendant's fingernails that yielded incriminating physical evidence. *Id.* at 292, 93 S.Ct. 2000. In upholding the search, the court held that because the police had probable cause to arrest, and because the evidence under the defendant's fingernails would have been lost or destroyed if the police had delayed, the circumstances justified a limited search "to preserve the highly evanescent evidence." *Id.* at 296, 93 S.Ct. 2000.

This exception was applied by the Appeals Court in a carefully reasoned opinion in *Commonwealth v. Skea*, 18 Mass.App.Ct. 685, 470 N.E.2d 385 (1984). There, the police had probable cause to arrest the defendant for possession of marijuana, but did not do so. *Id.* at 689–690, 470 N.E.2d 385. Instead, they searched the defendant's person for more marijuana or other controlled substances, and found a package of diamonds that ultimately were determined to be stolen. *Id.* at 686–687, 470 N.E.2d 385. The court observed that any further marijuana or other drugs on the defendant's person would most likely have been lost or destroyed before a warrant could be obtained. *Id.* at 691–692, 470 N.E.2d 385. Because there was probable cause to arrest and the "police action literally [had to] be 'now or never' to preserve the evidence of the crime," *id.* at 694, 470 N.E.2d 385, quoting *Roaden v. Kentucky*, 413 U.S. 496, 505, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973), the court upheld the search under the *Cupp* rationale. *Id.* at 697–698, 470 N.E.2d 385.

We recognize that it is possible to read the *Cupp* decision more narrowly than the Appeals Court did in its *Skea* opinion—for instance, as applying only to evidence as "highly evanescent" as the fingernail scrapings in the *Cupp* case, which were subject to "physical dissipation." *People v. Evans*, 43 N.Y.2d 160, 167, 371 N.E.2d 528, 400 N.Y.S.2d 810 (1977). Yet we agree with the *Skea* court that there is no principled reason not to apply the same rationale to any

evidence likely to vanish before a warrant is obtained. *See Commonwealth v. Skea, supra* at 697–698, 470 N.E.2d 385; 3 W.R. LaFave, Search & Seizure § 5.4(b), at 195 (4th ed. 2004) ("At a minimum, *Cupp* should be applied so as to permit, when there are grounds upon which a formal arrest could have been made, a more extensive search for any evidence reasonably believed to be in the possession of the suspect which might be unavailable later"). We note that the *Skea* decision has been cited by the Appeals Court for the proposition that the presence of evidence likely to vanish creates exigent circumstances justifying a warrant-less search or seizure upon probable cause. Similarly, most other jurisdictions to consider the question have taken at least as broad an interpretation of the exception in *Cupp*.

In the present case, the police had probable cause to arrest the defendants, having good reason to suspect that they had just participated in an undercover drug purchase. They likewise had reason to believe that the defendants were now carrying the money from this transaction, possi-bly the only physical evidence of their guilt. Given the fungible nature of money in general, and the tendency of illicit money to change hands quickly, this evidence would never be found if the police did not search immediately. In short, "the police officers' choices were limited to two: search now or never." *Commonwealth v. Skea, supra* at 699, 470 N.E.2d 385. Accordingly, the police pat frisked the defendant and found an object in his pocket that turned out to be the very wad of bills they anticipated finding. This was just the type of search upheld in the *Cupp* and *Skea* cases.

869 N.E.2d at 611–614 (footnotes and some citations omitted). I agree with the Massachusetts appellate courts' interpreta-tion of *Cupp*.

On the occasion at issue in the case at bar, Officer Russell's choices were similarly "limited to two: search [Petitioner] now or never." The contraband seized pursuant to that search should not be suppressed.

Judge Harrell and Judge Adkins have authorized me to state that they join this dissenting opinion.